With this understanding, we refuse appellant's petition for discretionary review.

**Milton CLAY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 272–86.**

Court of Criminal Appeals of Texas, En Banc.

Feb. 4, 1987.

George W. Baugh, San Antonio, for appellant.

Sam D. Millsap, Jr., Dist. Atty. and Karen Amos, Emil Holiner and Daniel Thornberry, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

**Perry KEETON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69639.**

Court of Criminal Appeals of Texas, En Banc.

April 15, 1987.

William L. Smith, Corsicana, for appellant.

Patrick C. Batchelor, Dist. Atty., Corsicana, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON REHEARING ON THE COURT'S OWN MOTION

MILLER, Judge.

Rehearing is granted on our own motion. *Langford v. State,* 578 S.W.2d 737 (Tex.Cr. App.1979). Our prior opinion is withdrawn.

Appeal is taken from a conviction for capital murder. V.T.C.A. Penal Code, § 19.03. After finding appellant guilty, the jury returned affirmative findings to the special issues under Art. 37.071(b), V.A.C. C.P. Punishment was assessed at death. Appellant brings six points of error. We will abate the appeal after answering appellant's contentions that may be resolved from the record before us.

In his fourth point of error, appellant contends that there was insufficient evidence presented to support the jury's finding that appellant would commit criminal acts of violence in the future which would constitute a continuing threat to society. In order to address this contention, we must review the facts of the offense and the evidence presented at the punishment stage of trial.

The record shows that on December 21, 1985, appellant, who had just turned 25 years of age, walked into the Thrift Mart Grocery store in Corsicana, Navarro County, wearing a green army jacket. He asked the clerk if the store carried fly spray. After the clerk, Carolyn Dechaume, and the store owner, Geraldine Robinson, directed him to where the spray was displayed, appellant turned as though he were going to get the spray. He then turned back, took one step, and fired a gun at the clerk. She fell to the ground,[1] then appellant fired at the store owner. Next, appellant went behind the cash register and went through the items on a shelf under the register. He retrieved a second gun and the victims' purses, and left the store.

Shortly thereafter, appellant walked back into the store. He "kind of peeped over the counter and said 'What happened here?'" In order not to excite appellant, Robinson responded, "Oh, nothing." Appellant then turned and ran out of the door.

Vernon Hensley, a Corsicana police officer, was on patrol at the time of the killing. He observed appellant running from the front of the store. When appellant saw the officer, he ran toward Hensley and stated that there were two men inside the store, and that something was wrong. Hensley

---

1. Dechaume died from the wounds she received.

went to investigate. Robinson said that a black man wearing a green army jacket was involved. Then, appellant ran away from the building.

Warran Loscuito, another Corsicana police officer, apprehended appellant, who was found hiding in a field. Appellant told Loscuito that his car had broken down and he obtained a ride with another male, who drove to the store for some gas. Appellant went inside and the other man came in and shot the two women.

Appellant took the stand in his own defense and stated that he had been riding with a friend, in the friend's car, and they stopped at the store for gas. Appellant went into the store and bought a pack of cigarettes. He conversed with Robinson for a short time and then walked to the back of the store to the soda cooler. Before he could reach the cooler, he heard the first shot and immediately fell to the floor. Approximately one minute later, he heard a second shot. He heard someone call his name, so appellant looked up and saw his friend, Ricky, who had two purses in his hand. They ran to the front of the store and Ricky hit appellant with the gun. The gun fired when appellant was struck. Appellant laid on the ground until Ricky left in his car. Appellant then got up, and saw an officer on patrol outside. Appellant ran out into the street and tried to flag down the officer, who did not see appellant. Appellant then saw Hensley, whom he stopped and told what was going on. Appellant then ran into the field, where he was later arrested. When appellant took the witness stand, the prosecutor asked if a person who would kill someone would have to be cold-blooded. Appellant laughed in response. The jury took approximately two hours to deliberate and found appellant guilty of capital murder.

During the punishment phase of trial, the State established that appellant had been convicted of possession of marihuana and placed on probation. Six months later, appellant's probation was revoked. Appellant had not been cooperative with his probation officer. Appellant put on no evidence on his behalf at the punishment stage of trial.

In his brief, appellant argues that:

"But this court has seemed to be inclined to hold that where an appellant has a clean or substantially clean history (unless is [sic] consists of other acts of violence), then the evidence must be overwhelming before it will sustain the death penalty by holding there is sufficient evidence for the jury to answer 'yes' to the second issue in the punishment stage." [2]

Appellant cites *Horne v. State*, 607 S.W.2d 556 (Tex.Cr.App.1980), in support of his contention.

In response, the State argues that the evidence was sufficient based upon the following facts:

1. The crime showed careful planning in that it was done in the dark, early morning hours when no one else would witness it.

2. Appellant deliberately took a firearm into the store to commit the robbery.

3. Appellant was in no way provoked into shooting the clerk, and gave no warning before he fired the gun, killing her.

4. Appellant told Officer Hensley a different story than that he gave Officer Loscuito, both of which differed from the version of facts he testified to at trial.

5. Appellant was not cooperative with the probation department.

6. Appellant was convicted of possession of marihuana.

---

**2.** We stress that "overwhelming" is appellant's allegation, not the standard adopted by this Court.

7. While on the witness stand, appellant laughed when asked if someone who killed someone would have to be pretty cold-blooded.[3]

When deciding whether there was sufficient evidence to support a jury's finding that a defendant will constitute a continuing threat of violence to society, this Court must view the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the elements of Art. 37.071(b)(2), supra, beyond a reasonable doubt. See *Santana v. State*, 714 S.W.2d 1 (Tex.Cr.App. 1986), and *Fierro v. State*, 706 S.W.2d 310, 313 (Tex.Cr.App.1986). At the penalty stage of trial, the jury may consider all of the evidence adduced at the guilt stage. *Santana*, supra at 8, and cases cited therein; and *Fierro*, supra at 319, and cases cited therein.

The jury is permitted to consider many factors when determining whether the defendant will pose a continuing threat of violence to society. Those factors include, but are not limited to:

1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;

2. the calculated nature of the defendant's acts;

3. the forethought and deliberateness exhibited by the crime's execution;

4. the existence of a prior criminal record, and the severity of the prior crimes;

5. the defendant's age and personal circumstances at the time of the offense;

6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;

7. psychiatric evidence; and

8. character evidence.

See *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App.1980); *Milton v. State*, 599 S.W.2d 824 (Tex.Cr.App.1980); and *Hovila v. State*, 562 S.W.2d 243 (Tex.Cr.App.1978).

In order to determine whether the facts present in the instant case were sufficient, we may look to other cases where the State failed to present sufficient evidence. In *Roney v. State*, 632 S.W.2d 598 (Tex.Cr. App.1982), the defendant was found guilty of capital murder, specifically, murder committed in the course of robbery. The defendant and two other men went into a convenience store and the clerk was shot after money was taken from the register. The defendant had participated in a different robbery minutes before the capital murder occurred. The evidence also showed that the defendant had laughed about the murder. He did, however, surrender himself to the police three days after the offense was committed. There was no psychiatric evidence offered, nor was the defendant shown to have a criminal record.

In finding that the facts of the case did not support an affirmative finding to the second special issue regarding future dangerousness, this Court stated, id. at 603:

"Although this was a senseless murder, that fact is true of every murder in the course of a robbery. The facts of this offense, standing alone, do not carry the marks of a 'calculated and cold-blooded crime,' such as appeared in *O'Bryan v. State*, 591 S.W.2d 464, 480 [Tex.Cr.App.

---

**3.** In its brief, the State includes two facts which are not mentioned above: that appellant "calmly" took what he wanted from behind the counter (under the register), and that appellant "calmly" went back into the store to ask Robinson what had happened. These facts were excluded from our consideration since they were not supported by the record.

1979], where the defendant for months planned the candy poisoning of his own child to collect life insurance. To support a 'yes' answer to the second punishment issue, the evidence must show beyond a reasonable doubt that there is a probability appellant would commit criminal acts of violence that would constitute a *continuing* threat to society. To hold that the facts of *this* offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery would warrant the death penalty. Such a construction would destroy the purpose of the punishment stage in capital murder cases, which is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition." [citations omitted and emphasis in original].

This Court further held that given that the facts of the offense itself were not inherently sufficient, and that the State had not presented any additional evidence, the State had not shown beyond a reasonable doubt that the defendant would commit criminal acts of violence in the future which would constitute a continuing threat to society.

This Court made a similar holding in *Garcia v. State*, 626 S.W.2d 46 (Tex.Cr. App.1982). In *Garcia,* the defendant was convicted of murder committed in the course of robbery. The record showed that two Mexican nationals, Lopez and Villanueva, crossed the Mexican border looking for work. They came upon the defendant and some of his friends, and asked to be taken to a taxi stand so that they could be taken to Brownsville. The defendant and one of his friends, Barrientes, drove the two men to a service station. After leaving the service station, the defendant placed a gun to Lopez' head and demanded his money. When Lopez agreed to give the defendant his money, the defendant shot

Lopez. Barrientes and Villanueva left the car and began to run. A short time later, Villanueva saw the defendant aim the gun at him, but the defendant did not shoot. The next day, the police found Lopez' body in the grass near a river levee about five minutes from the service station. Lopez' watch and wallet were missing. During the trial, Barrientes, a co-defendant, testified that after the shooting, the defendant had poured salt on the blood stain in the car and told Barrientes not to say anything. At the penalty stage of the trial, the only evidence offered was that of a doctor of psychology, who stated that he believed that the defendant would be a continuing threat to society.

This Court found that the State had not sustained its burden of proof with regard to the second punishment issue, and stated:

"There was no showing of a prior criminal record or prior acts of violence on the part of the 31-year-old ex-marine [defendant]. This was not a case where the robbery feature of the offense was long in the planning stage or a case where an armed individual drives around searching for an ideal situation for a robbery, intending to use violence if necessary. . . .

This was a senseless and unnecessary murder, and the jury may well have been incensed by what they considered perjury . . . [when the defendant gave evidence of an alibi]. Nevertheless, we cannot conclude the evidence, taken as a whole, is sufficient to support the jury's finding on the issue of future dangerousness."
*Id.* at 51-2.

Another case in which this Court held that the State had not met its burden of proof regarding the second special issue is *Wallace v. State*, 618 S.W.2d 67 (Tex.Cr. App.1981). In this case, the defendant was charged with murder committed in the course of robbery. The evidence at the guilt stage of trial was disputed, but it was undisputed that the defendant did not him-

self kill the victim. Rather, the murder was committed during a robbery by the defendant's companion. The defendant testified that the victim was killed in self-defense during an argument that arose during a drug transaction.

On cross-examination, the defendant admitted that he had discussed possible robberies with the person who hired him, but had not committed any. The evidence did show that he had been involved in an unsuccessful robbery attempt a few weeks before the murder and robbery then before the Court. The only other evidence of misconduct admitted concerned a military violation where the defendant had been absent from his place of duty.

The Court stated, id. at 69:
"There was no other evidence presented that could be considered relevant to the issue of future violent conduct. Specifically, there was no evidence of prior convictions, no prior acts of violence, no character evidence, no psychiatric evidence. Although the circumstances of the murder may be sufficient to support a death penalty, *Duffy v. State*, Tex.Cr. App., 567 S.W.2d 197, this is not such a case. We are of the opinion that the evidence is insufficient to support the 'yes' finding on the issue of future violent conduct."

Another case in which there was insufficient evidence to support an affirmative finding on the second special issue was *Brasfield*, supra. In this case, the defendant was convicted of murder in the course of kidnapping. The evidence showed that the body of a six-year old boy had been found in a canyon, not far from a dirt road. The child had died of asphyxiation, and the body exhibited a bruise on the head and face, and numerous stab wounds inflicted after the child's death. Although the child's trousers had been pulled down over his legs, the decomposition of the body

rendered it impossible to determine whether sexual assault had occurred. The boy had last been seen with the defendant, in the defendant's truck driving toward the canyon. Witnesses testified that later that afternoon, the defendant was seen driving away from the canyon, alone, at a high rate of speed.

The State rested after its direct case, and did not present any evidence at the punishment stage of trial. There was no evidence admitted concerning extraneous criminal acts committed by the defendant, nor was psychiatric or character evidence offered. The defendant did not present any evidence on his behalf during the punishment stage of trial.

This Court held that there was insufficient evidence presented to support the jury's affirmative finding that the defendant would constitute a continuing threat of violence to society. Although the circumstantial evidence supported the conclusion that a violent criminal act had been committed, there was simply no evidence that the defendant would pose a serious risk to the community in the future.

Last, this Court sustained a defendant's contention that there was insufficient evidence to sustain a finding of future threat in *Warren v. State*, 562 S.W.2d 474 (Tex. Cr.App.1978). In that case, the Court stated, id. at 476–7:

"The facts of the instant case reflect a criminal act of violence, but it was not a calculated act. The State's evidence in the form of appellant's confession shows the appellant went unarmed to the deceased's house for the purpose of burglarizing the house. There he found a pistol, which he placed in his coat pocket. He was surprised in the bedroom by the deceased, whom he did not know. When the deceased pulled a gun, yelled at him and threatened to kill him, he shot the

deceased. The confession reflects appellant was so scared 'he was going to shoot us that I didn't know what I was doing.... I don't remember shooting him but I was the only one that had a gun.'

. . . .

Thus, there was no evidence of past violence, no evidence that violence was initially intended during the burglary and no evidentiary predictions of future violence." [4]

The Court concluded that the facts of the case, along with the defendant's meager prior conviction record, there was insufficient evidence to establish that the defendant would constitute a continuing threat of violence to society.

█ We may now decide whether the instant facts alleged to support the affirmative finding on the second special issue. Certainly there is little evidence of provocation in the case before us. Cf. *Wallace*, supra, *Warren*, supra, and *Horne*, supra. According to the State's witness, the murder was clearly senseless, unnecessary and cold-blooded. With this, we have no dispute.

There is, however, no evidence showing that appellant would commit criminal acts of violence in the future which would constitute a *continuing* threat to society. There was no psychiatric evidence, cf. *Garcia*, supra, nor character evidence, cf. *Horne*, supra, nor was there any evidence showing that appellant had committed violent acts in the past. See *Roney*, supra, *Garcia*, supra, *Horne*, supra, *Brasfield*, supra, and *Warren*, supra.

Although the facts of the instant case show that appellant acted in a violent and

aberrant way, we are forced to conclude that there was insufficient evidence to show that he would pose a future threat of violence to society. As was stated in *Horne*, supra, we are bound by the law to make certain that the death sentence is not "wantonly or freakishly" imposed, and that the purposes of the jury's consideration of the two special issues set forth in Art. 37.071(b), supra, are accomplished. Every murder committed in the course of robbery is in some way cold-blooded and senseless. Each such murder does not, however, merit the death penalty, our most final punishment.

We therefore find that, viewed in the light most favorable to the jury's finding, there was insufficient evidence to support the jury's finding that appellant would constitute a continuing threat of violence to society under Art. 37.071(b)(2), supra. We sustain appellant's fourth point of error.

In his fifth point of error, appellant contends that the trial court erred in allowing the district attorney to exercise peremptory challenges against three members of the black race, given that appellant was also a member of that race. The record shows that when each of these jurors were excused, appellant's attorney objected on the basis that each was black, as was appellant. The trial court overruled the objections without comment. A fourth black venireman was not struck peremptorily, and served on the jury. Appellant contends that the prosecutor struck the other black persons solely on the basis of race, as was denounced in the Supreme Court's recent decision in *Batson v. Kentucky*, —— U.S. ——, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

In *Batson*, supra, which was decided and issued approximately two weeks before the

---

**4.** During the punishment stage of trial, the State offered a pen packet as to a four year felony theft conviction, for which the defendant had been placed on probation. Probation had been revoked six months later as a result of a burglary of a coin-operated machine. After the State rested, the defense presented no evidence at the punishment stage of trial.

instant trial was conducted, the Supreme Court reiterated its observation that the State's purposeful or deliberate denial of jury participation to black persons because of race violates a defendant's rights under the Equal Protection Clause of the United States Constitution. Thus, a prosecutor may not challenge potential jurors solely on account of their race. In order to invoke the protections set forth in *Batson*, supra, a defendant must establish purposeful discrimination by showing that:

1. he was a member of a cognizable racial group;

2. the prosecutor had exercised peremptory challenges to remove from the venire members of the defendant's race (peremptory challenges constitute a jury selection practice which permits those to discriminate who are of a mind to discriminate); and

3. the facts and any other relevant circumstances raise an inference that the prosecutor used peremptory challenges to exclude the veniremen on account of their race.

If the defendant raises an inference of purposeful discrimination through the State's use of its peremptory strikes, and the trial court determines that a prima facie case of discrimination exists, then the burden shifts to the prosecutor who must come forward with a neutral explanation for the challenges. The trial court must then determine whether despite the State's explanation, the defendant has established purposeful discrimination. The Supreme Court in *Batson*, supra, stressed that not just any explanation would do, and in fact

some explanations would per se not be sufficient. *Batson*, supra, 106 S.Ct. 1722, 1723. By largely judging credibility of the prosecutor, content of the explanation and all other surrounding facts and circumstances, the trial judge must make a finding of fact concerning purposeful discrimination which should be given great deference by a reviewing court. *Batson*, supra, n. 21.

Under *Batson*, supra, if such purposeful discrimination is established, the trial court must remedy the situation. Because of the variety of jury selection practices followed in this nation, the Supreme Court was careful not to specify any exclusive remedy. Therefore while it enumerated the two most logical remedies, discharge of the panel and selection of a new jury from a new panel, or disallowing the strike(s) and reinstating the minority jurors, it declined to choose which would be more appropriate in any particular case. Clearly the view of the Court is that individual trial judges have the power to do either. *Batson*, supra, n. 24.

In the instant case, the record shows that when each black potential juror was struck, appellant's counsel objected on the basis that the juror was black, as was appellant. The trial court overruled the objections without comment or hearing. One black person did serve on the jury.[5] Appellant claims on appeal that he was entitled to the protections afforded under *Batson*, supra.

Initially, we find that the issue regarding the State's use of its peremptory strikes was timely presented to the trial court. See *Henry v. State* (Tex.Cr.App. No.

---

5. In its brief, the State asserts that the *Batson* issue is not raised since one black juror served on the panel. We find nothing in the language of the *Batson* opinion which limits its application to only those cases where *all* of the prospective jurors of the defendant's race were excluded from the panel. Rather, the opinion seems to indicate that regardless of the number of minority race veniremen that actually serve, the prosecutor may not use peremptory strikes to eliminate *any* potential juror solely on the basis of that juror's race.

1216–85, delivered April 8, 1987). Thus, we must next determine whether the trial court properly considered the issue raised.

As stated previously, after appellant's attorney objected to the State's use of its peremptory strikes, the trial court overruled the motion without comment. Clearly the record indicates that the trial court did not hold a hearing to demand of the prosecutor neutral explanations for his strikes against black prospective jurors, as contemplated in *Batson,* supra. The record is not, however, clear as to the basis of the trial court's decision not to hold the hearing. It may well be that the trial judge did not believe that an inference of purposeful discrimination had been raised.

It may also be that the court was unaware of the procedure to follow or the ramifications of the change in the law brought about just two weeks before in *Batson.* The *Batson* holding effects a radical departure from the previous policy of holding the reasoning behind peremptory strikes sacrosanct:

> "To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change in the nature and operation of the challenge. The challenge, *pro tanto,* would no longer be peremptory, each and every challenge being open to examination, either at the time of the challenge or at a hearing afterwards. The prosecutor's judgment underlying each challenge would be subject to scrutiny for reasonableness and sincerity. And a great many uses of the challenge would be banned."

*Swain v. Alabama,* 380 U.S. 202, 221–222, 85 S.Ct. 824, 836–837 (1965).

Also, the concept that an inference of racially motivated jury selection could be demonstrated by the strikers themselves was as new as the procedure outlined by the Supreme Court:

> "For example, a pattern of strikes against black jurors included in the particular venire might give rise to an inference of discrimination."

*Batson,* supra, 106 S.Ct. at 1723.

■ The Supreme Court was confident that the trial judiciary, experienced as it is in voir dire, would be able to determine whether the prosecutor's use of challenges created a prima facie case of discrimination. Thus, such a determination must be made when the use of the strikes is challenged. Given the state of this record, we cannot say that such a determination was made and thus we are unable to judge whether the trial court erred in failing to required the prosecutor to come forward with a neutral explanation for the exercise of its peremptory strikes, or erred in not following the remaining procedure outlined in *Batson,* supra. See *Henry,* supra.

We will therefore remand this case so that the trial court may conduct the *Batson* hearing. At this hearing, appellant should be given the opportunity to show that the inference that the State improperly exercised its peremptory strikes has been raised. If appellant makes this showing to the satisfaction of the trial court, the State should then be required to come forward with a neutral explanation for the use of its strikes. If the trial court determines, under *Batson,* supra, that purposeful discrimination has been established, then the trial court should enter this finding in his findings of fact and conclusions of law.

We also note that, given out disposition of appellant's first point of error attacking the sufficiency of the evidence presented to support the jury's affirmative response to the second special issue, should appellant be retried, the State will be precluded from seeking the death penalty. See *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

The punishment in the judgment is reformed to life. Pursuant to Tex.R.App. Pro. 81(a) this appeal is hereby abated with instructions to the trial court to conduct further proceedings consistent with this opinion and *Batson* supra, and *Henry*, supra. The record of those proceedings together with results of those proceedings and any findings of fact and conclusions of law are to be forwarded to this Court.

It is so ordered. No motion for rehearing will be entertained. Tex.R.App.Pro. 2(b).

W.C. DAVIS and WHITE, JJ., dissent to the disposition of appellant's fourth point of error.