**Willie Lee McKINNEY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–87–071–CR.**

Court of Appeals of Texas,
Waco.

Dec. 17, 1987.

Carolyn G. Kousz, Waco, for appellant.

Vic Feazell, Cr. Dist. Atty., Jim Vandygriff, Asst. Dist. Atty., Waco, for appellee.

OPINION

THOMAS, Justice.

This is a murder case in which the jury assessed a life sentence. The charge on punishment contained the parole instruction required by section 4(a) of article 37.07 of the Code of Criminal Procedure, which was given over Appellant's objection that the instruction violated his right to due process and the doctrine of separation of powers. *See* Tex.Code Crim.Proc.Ann. art. 37.07, sec. 4(a) (Vernon Supp.1987). Section 4(a) of article 37.07 and the instruction itself was recently declared unconstitutional by the Court of Criminal Appeals. *See Rose v. State*, No. 193–87 (Tex. Crim.App., Nov. 12, 1987) (not yet reported). However, the court affirmed the conviction in *Rose* because, under the rules in *Almanza*, the record as a whole did not show that the accused had suffered "egregious harm" from the parole instruction which had been included in the charge without objection. *See id.; Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1985) (on motion for rehearing). Here, the question is whether Appellant suffered "some harm" from the parole instruction being given over his timely objection. *See Almanza*, 686 S.W.2d at 171. Considering the charge as a whole, the weight of the

probative evidence showing a premeditated and cold-blooded murder, the contested issues, the arguments of counsel, and the entire record, Appellant's conviction will be affirmed upon a finding that he was not harmed by the instruction.

█ Manuel Ruiz, who was sixteen-years old at the time of his death, lived with his parents and six brothers and sisters in two downstairs apartments at 1100 North 17th. On June 5, 1986, Manuel returned home from work at 5:30 p.m. and began drinking beer with his older brother, Jessie Ruiz, and a cousin, Jessie Garza. Appellant, who was apparently seventeen when he committed the murder, arrived at the apartment house with Anthony Cole, age sixteen, at about 6:30 p.m. Appellant had been there earlier that day helping his girlfriend and her mother move into an upstairs apartment. Appellant and Manuel and Jessie Ruiz, who had once gone to school together, moved to the second-floor balcony of the apartments at approximately 8:00 p.m. to talk and drink beer. They were accompanied by Jessie Garza and Anthony Cole.

Shortly before 11:00 p.m., Manuel and Jessie Ruiz, Jessie Garza, Appellant and Anthony Cole decided to wrestle each other in a vacant lot next to the apartment house. Manuel Ruiz wrestled his brother, Jessie, and then Jessie Garza wrestled Appellant. During the match between Appellant and Garza, which apparently began without any animosity between the two, Appellant's white slacks became grass-stained when Garza threw him to the ground. After Appellant got angry and started cursing Garza, the two started "body punching" each other, but neither was injured by the blows. Appellant warned Garza, "I'll be back later and take care of you", and then left in his car with Anthony Cole. Manuel Ruiz was not involved in the altercation between Appellant and Garza, as he had merely stood by watching the two wrestle and punch each other.

Appellant and Cole drove to a nearby convenience store where they met Julius Morales, age seventeen, who lived in the neighborhood. Appellant asked Morales if he wanted to go with him because "he was going to kill a Mexican." This conversation took place around 12:30 a.m. on June 6. Appellant and Cole then drove to the house of Appellant's uncle and borrowed the .38 caliber pistol which was later used in the murder. They had to drive to another location to get ammunition for the pistol. Finally, they drove to a third residence and borrowed a .22 caliber rifle for Cole to use. However, Appellant's car overheated while he was inside picking up the rifle, and the person who loaned him the weapon drove him and Cole back to the apartment house.

Appellant and Cole arrived at 1100 North 17th around 1:00 a.m., and walked along the side of the house to the front porch where they found Manuel Ruiz' father and grandmother, Juan Ruiz and Santos Gardenas, talking. Appellant had the pistol stuck in the back of his pants and Cole was carrying the rifle. Manuel and his brother, Jessie, were already asleep inside the house. Appellant first demanded to talk to Jessie Garza, whom he had threatened "to take care of" two hours earlier, but Juan Ruiz told him that Garza had left. Ruiz told Appellant and Cole to "please go home ... in the morning you can come back and talk it out", but Appellant refused. During this conversation, Ruiz and Gardenas both saw the pistol in the back of Appellant's pants. Ruiz also asked Appellant to lower his voice because he was concerned that the commotion might awaken his sons, but Appellant began to demand in a loud voice to talk to Manuel Ruiz.

Manuel, who was dressed only in blue jeans and socks, soon came out of the house onto the front porch, at which time Appellant and Cole retreated to the street in front of the house where a car was parked next to the curb. Mrs. Gardenas watched while Juan Ruiz entered his apartment to call the police. She described how Manuel stood by the side of the car next to the curb, leaning on its hood with his arms folded across his chest, while he talked to Appellant and Cole as they stood in the street on the other side of the car. The parties did not appear to be yelling or talking loud to each other. Suddenly, Appellant raised the pistol and fired at Manuel

who was still leaning on the car with his arms folded. The bullet struck him in the chest, severing the aorta, and he bled to death within a few minutes as he lay on the front porch. Appellant and Cole both ran down the street immediately after the shot was fired. Julius Morales, who earlier had been told by Appellant that "he was going to kill a Mexican", happened to be sitting on his front porch when he heard the shot and saw Appellant and Cole running down the street.

Appellant was arrested at 7:30 a.m. on June 6th, and later that day gave police a written confession. He then showed an officer where he had hidden the pistol in some dirty clothes. Appellant admitted in his confession that Manuel's hands were on the hood of the car when he shot him, and that he had carefully aligned the cylinder with the barrel of the pistol before he fired the shot.

Considering Appellant's own statements before and during the trial, the only seriously contested issue during the first phase of the trial was whether he had acted in self-defense. His testimony, that he felt surrounded and threatened by the onlookers while he and Garza were wrestling, was contradicted by his own admission that Manuel Ruiz had not participated in the affray or committed any provocative act toward him earlier that evening. Anthony Cole even admitted that Manuel was just "standing around" while Appellant and Garza fought. Likewise, the admission in his confession, that he shot Manuel while his hands were still on the hood of the car, effectively destroyed his contention during the trial that he thought Manuel was trying to "come at me" across the hood of the car. Clearly, the jury could have reasonably believed that Appellant had concocted his defensive theory out of thin air, long after he had given the correct version of events in his confession. The jury rejected the claim of self-defense during the guilt-innocence phase of the trial, and thus the parole instruction in the charge on punishment could not have harmed Appellant's defense on the merits.

The overwhelming weight of the evidence, including his own confession and admissions from the stand, clearly established Appellant's identity and guilt as Manuel Ruiz' murderer. Furthermore, the jury could have reasonably believed from the evidence as a whole that he committed the crime dispassionately, without reason, provocation or justification, that he acted rationally, coldly, deliberately and premeditatedly, and that he murdered Manuel Ruiz because his cousin, Jessie Garza, had stained Appellant's white pants during the wrestling match. Thus, the only remaining issue for the jury to decide was what sentence should be assessed for the premeditated, cold-blooded murder.

The prosecutor during his argument on punishment asked the jury again and again to assess a life sentence for the crime. Assessment of a life sentence, in fact, became the centerpiece of his closing argument. He stressed facts showing the senselessness of the act, the innocence and age of the victim, the careful preparations for the murder, the cold-blooded manner in which it was carried out, and emphasized that Appellant had been arrested for burglary of a habitation within a month prior to the murder. However, Appellant asked the jury for "mercy" and a ten-year probated sentence. Neither party referred to or discussed the parole instruction during their argument on punishment. The prosecutor stated the following during his final plea for a life sentence:

I say make a strong statement against murder in McLennan County, so that when somebody gets their pride a little hurt or they're a little bit upset, tough, you can't kill anybody. And if you kill somebody, we're going to send you to the pen for your life, because you sentenced Manuel Ruiz to death. You sent him away for the rest of his life. If you can do that in cold blood, then we as a jury can send him—we can send you down for the rest of your life, or *whatever the parole board is going to do.*

(Emphasis added).

To consider such an innocuous and passing reference to parole, when accompanied

by the unconstitutional parole instruction, as evidence that the jury must have assessed Appellant a greater sentence than he would have otherwise received to compensate for the anticipated action of parole authorities would ignore the aggravated facts and circumstances surrounding the murder. The senselessness of the murder, when combined with Appellant's premeditated and cold-blooded actions, clearly justified the jury's verdict of life in prison. Considering the entire charge, the contested issues, the argument of counsel, and the weight of the probative evidence, one cannot reasonably say from the record as a whole that Appellant suffered "some harm" or, in fact, any harm as a result of the parole instruction being included in the charge over his proper objection. Accordingly, point one is overruled.

Appellant, who is black, also complains in a second point of error about the court overruling his objection to the racial composition of the jury. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. 2d 69 (1986). He argues that the State used its peremptory strikes in a racially discriminatory manner to remove all blacks from the jury panel, and that the reasons the prosecutor gave for the strikes were not racially neutral.

The protection under *Batson* is available to a defendant who can establish purposeful discrimination by showing that: (1) he is a member of a cognizable racial group; (2) the prosecutor has used peremptory challenges to remove members of the defendant's race from the jury panel; and (3) facts and other relevant circumstances raise an inference that the prosecutor used the peremptory strikes to exclude the jurors because of their race. *Keeton v. State*, 724 S.W.2d 58, 65 (Tex.Crim.App. 1987). Once he has made a *prima facie* showing of purposeful discrimination, the burden shifts to the prosecutor to present racially neutral explanations for the strikes. *Id.* The trial court must then determine whether the defendant has established purposeful discrimination despite the prosecutor's explanation. *Id.* Because the court's findings depend on the evalua-

tion of the content of the explanations, the surrounding circumstances, and the credibility of the prosecutor, a reviewing court should give its findings great deference. *Id.*

The following occurred after the parties had made their strikes but before the jurors selected were sworn:

[DEFENSE COUNSEL]: The Defendant would make an objection to the composition of the jury. I would like the record to reflect that the jury is all white, and my client is black, and there were minorities on the jury panel, but they all were struck.

[PROSECUTOR]: Your Honor, I believe we have three Hispanic people on the jury, so not all were struck.

THE COURT: All right, go ahead, [Prosecutor].

[PROSECUTOR]: Your Honor, I am not sure which were which, but as I recall, juror 16, 17 and 18, I believe were black females, and they all had sons within—or at the same age as the defendant. I don't know who else was black on the jury. I take it that is who you are objecting to.

THE COURT: Do you know which ones were black on the jury. I didn't write it down.

[DEFENSE COUNSEL]: Holder was a young black guy.

[PROSECUTOR]: I can tell you, Judge.

THE COURT: All right.

[PROSECUTOR]: Number 10, number 16, 17, 18, 22.

[PROSECUTOR]: # 22 wasn't black. She was Hispanic, I believe. I remember Mr. Holder was approximately two to three years older than the defendant. I can remember the three ladies that had sons the defendant's age, and then one guy who was his age.

[PROSECUTOR]: Who said something to him right before we picked the jury?

THE COURT: Who is that?

[PROSECUTOR]: Number 28 said something to the defendant before the jury was picked.

THE COURT: All right.

[PROSECUTOR]: The State just felt that people with—women with sons the defendant's age would have too much in common, and view the defendant in the eyes as if it were their son.

THE COURT: All right, Sir. Anything else on this?

[DEFENSE COUNSEL]: We would ask the strikes of the State and the defense be included in the record.

THE COURT: They are included, I have got them right here. Overrule the Motion, let's go.

The appellate record does not contain a list of the prospective jurors, any personal-history sheets filled out by the jurors prior to *voir dire*, or a list of the parties' strikes. Furthermore, the transcription of *voir dire* does not reflect the numbers assigned to members of the panel, their race or sufficient personal information about the jurors questioned that would be essential to review the ruling on Appellant's objection. The burden is on the defendant to present an appellate record that is sufficiently complete to demonstrate error. Tex.R.App.P. 50. Neither the holding in *Batson* nor any decision by the Court of Criminal Appeals interpreting *Batson* negate this basic rule of appellate procedure. Considering the deference due the court's ruling on appeal and the state of the record, the court cannot be said to have erred when it accepted the prosecutor's explanations for the peremptory strikes, which did not appear to be based on race, as being racially neutral. *See id.* Point two is overruled.

Affirmed.