James Carl LEWIS, Appellant,

v.

The STATE of Texas, Appellee.

No. 12–87–00247–CR.

Court of Appeals of Texas,
Tyler.

March 20, 1989.

Barry L. Goodwin, Tyler, for appellant.

Jack Skeen, Jr., Dist. Atty., Tyler, for appellee.

COLLEY, Justice.

James Carl Lewis was convicted of involuntary manslaughter.[1] The trial judge assessed punishment at five years.

Lewis alleges three points of error. By his third point, he claims the court erred in overruling his motion for instructed verdict and his motion for new trial because the evidence is insufficient to sustain his conviction. This claim rests on two bases: (1) Lewis' written confession contained exculpatory statements which were not disproved by the State as required by the "voucher" rule explained in *Palafox v. State*, 608 S.W.2d 177 (Tex.Cr.App.1979), and (2) the evidence is insufficient to prove that the victim's injuries caused her death on September 27, 1986.

The record reveals that on September 7, 1986, Lewis was operating an automobile proceeding north on North Moore Street in Tyler; that he was intoxicated; that he ran a stop sign located on North Moore Street; and that he collided with a small car driven by the victim, Gina Marie Rice, who was driving west on Martin Luther King Boulevard. Rice, a young white female, suffered personal injuries in the collision, viz., an open fracture of her left kneecap and various abrasions and contusions to both of her legs, as well as a minor head wound. Rice was hospitalized on September 7, treated surgically, and discharged on September 23, 1986. On that day Rice's mother, Evelyn Hendley, took Rice to Hendley's home on Lake Palestine. On September 27, 1986, Rice experienced breathing problems. Her mother called an ambulance which transported Rice to Medical Center Hospital in Tyler, where she died in the emergency room. The immediate cause of Rice's death was conclusively shown to be a pulmonary embolism, that is, a blood clot which circulated through Rice's heart and thus entered and blocked her main pulmonary artery.

Three physicians testified at trial: David Carney—an orthopedic surgeon and Rice's treating physician, V.V. Gonzales—a forensic pathologist, and Stan Lightfoot—a pathologist. Both Carney and Gonzales, who were called by the State, testified that the embolus which obstructed Rice's pulmonary artery, causing her death, formed because of the injuries received by Rice in the collision. Lightfoot, appearing for Lewis, was equally positive, in his opinion, that Rice's injuries did not produce the embolus, but that Rice's undisputed obesity and immobility during her long sixteen-day stay in

1. Under Tex.Penal Code Ann. § 19.05(a)(2) (Vernon 1989).

the hospital had been the cause of the embolism.

Two blood samples were taken from Lewis following the collision. The first was taken in Medical Center Hospital by a nurse for therapy purposes—blood work-up. The second was taken at the hospital at the request of a law officer. The first sample was analyzed by the hospital laboratory, and its results showed 0.33 grams of alcohol per 100 milliliters of blood. The second sample was taken about an hour later and it showed 0.23 grams of alcohol per 100 milliliters of blood.

Lewis gave a voluntary statement on October 6, 1986, to Police Detective Swindle. In that statement, Lewis admitted to drinking some beer and vodka and driving his car. He stated that he tried to stop at the stop sign on North Moore Street, saying, "I tried to stop but could not. I decided to turn to the right so I would not hit anyone, but I did not make it. The last thing I remember was hitting the other car."

 We now determine the merits of Lewis' third point of error. He contends under that point that the "exculpatory" statements claimed to be contained in his confession were not disproved by the State. The voucher rule explained in *Palafox* has been abolished by Tex.R.Crim.Evid. 607, which was promulgated by the Court of Criminal Appeals effective on September 1, 1986. *See Ibanez v. State*, 749 S.W.2d 804, 807 n. 3 (Tex.Cr.App.1986). Lewis also argues under the point that the evidence is insufficient to establish beyond a reasonable doubt that Rice's death was caused by the injury she received in the collision on September 7, 1986. We disagree. There was conflicting medical opinion on this causal issue; however, viewing the evidence in the light most favorable to the verdict, we conclude that reasonable jurors could have found each essential element of the offense beyond a reasonable doubt. Lewis' third point of error is overruled.

 Lewis argues under his second point of error that the court erred in overruling his motion for mistrial following the testi-mony of Rice's 9-year-old son, who was riding in his mother's car at the time of the collision. The child testified briefly that he was a passenger in his mother's car. He stated that the only thing he could remember about the collision was a "big jerk" and that he later "woke up on the grass." Following that testimony the court, sua sponte, retired the jury and questioned the prosecutor concerning the relevance of the child's further testimony. Following a dialogue with counsel, the court granted Lewis' motion to strike the child's testimony, but overruled Lewis' motion for a mistrial. When the jury was returned to court, the trial judge instructed them "not to consider the testimony [of the child] for any purpose. You will not permit yourself to be influenced in any degree whatsoever by any sympathy that might be engendered by the appearance of the child whose mother is the victim in this case." In our opinion, the trial judge was, if anything, overly cautious. His instructions certainly removed any harm to the defense which resulted from the child's testimony, if any there was. The point is meritless and is overruled.

 Under his first point of error, Lewis, a black man, claims that *Batson*[2] error occurred in the selection of the petit jury.

The State peremptorily challenged six black prospective jurors, viz., Cassandra D. McCullough, Helen Ware Robinson, Willie Drew Hampton, Timothy Roy Mallard, Sandra Mayfield Davis, and Edith Mayfield Wilson.

During the voir dire examination the prosecutor individually questioned only two of the six challenged venirepersons. The following summary fairly represents the voir dire examination of those two venirepersons.

### SANDRA MAYFIELD DAVIS

The prosecutor asked the panel if anyone was acquainted with Lewis or "his family." Mrs. Davis replied, "I think I may know some of his family." Following further

2. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

inquiry Davis told the court, "[She] could be a fair and impartial juror."

## EDITH MAYFIELD WILSON

When the prosecutor asked the panel if any member knew Dr. Virgil Gonzales, Mrs. Wilson raised her hand, and at the request of State's counsel stood. She was then asked, "Do you know Dr. Gonzalez?," to which she replied, "I don't know him personally. He was a witness in the case that I was involved in." Wilson, upon further questioning by the prosecutor, did not identify the case except to say, "It was a little over a year ago." She also stated that her "knowledge of Dr. Gonzalez" would not affect her services as a "fair and impartial juror."

## HELEN WARE ROBINSON

Ms. Robinson was not questioned individually, but when the prosecutor asked the panel, "Is there anyone on the panel who doesn't drink alcohol at all, who abstains from drinking alcohol?[,]" Mrs. Robinson raised her hand, thereby indicating that she did not drink alcohol. The prosecutor then asked the entire panel:

> Those who just raised your hand ... even though you don't drink, would that influence your opinion one way or the other to be a fair and impartial witness.... Would you be able to sit on the jury ... listen to all the evidence before you render an opinion? [sic]

At this point, the prosecutor asked the following question of the panel:

> All those who raised your hand and indicated you don't drink, is there anything about that that you would hold against the defendant here today or is there anybody who could not be a fair and impartial juror because they don't drink? Anybody who could not be?

The record reveals that no venireperson responded to the last question. The remaining challenged black venirepersons, Cassandra D. McCullough, Willie Drew Hampton, and Timothy Ray Mallard, were not individually questioned on voir dire by the State and made no individual responses to questions propounded to the panel. Mr. Mallard, however, was questioned briefly by defense counsel regarding a matter immaterial[3] to the issues before us.

Following voir dire examination, Lewis timely moved the court to quash the venire and grant a mistrial. On July 13, 1987, the trial court conducted an evidentiary hearing on the *Batson* motions and the prosecutor who handled the voir dire examination for the State, Joe Worthington, testified in an effort to make a racially neutral explanation for each of the six strikes.

Mr. Worthington's direct testimony respecting each of the challenged jurors is as follows:

## CASSANDRA D. McCULLOUGH

"She's very young,[4] 22 years of age. She appeared bored during portions of the voir dire, but in particular, the reaction that comes to mind most is when the Judge, for lack of a better word, corraled or scolded Mr. Goodwin [defense counsel] during voir dire that she turned and was frowning. I didn't know if that means she liked what the Judge was doing or didn't care for what the Judge was doing to Mr. Goodwin, but in my mind that played a fairly large role in striking her...."

## HELEN WARE ROBINSON

Helen Robinson appeared to be a very good juror. We came close to keeping her on there. She didn't drink, was one who didn't like the idea of drinking and driving. The only question with her was when she would grin and laugh at Mr. Goodwin. I don't know if she liked him or was laughing when the Judge was scolding him or what her purpose was. At that point we don't have a chance to

---

3. Defense counsel, in essence, asked Mr. Mallard if he would listen to defense evidence before deciding the case and received an affirmative answer from the juror.

4. Jury information forms which were completed by each juror and returned to the court contained information concerning the juror's age, marital status, employment, etc.

ask her any more questions so it is difficult to determine her intent except at that point we didn't feel we could leave her on the jury panel with that question.

## WILLIE DREW HAMPTON

"He was struck. The main reason for his strike was the mustache Mr. Hampton had." Worthington went on to explain that the prosecutor's office had "made it a fairly regular routine to strike jurors who [have beards and mustaches]." At that point, the trial judge noted that the State did not strike a white juror who had a mustache.[5]

In response to the court's questions, Mr. Worthington stated that a prospective juror who wears a mustache

is at least more liberal minded.... That is not always the case but we have to have some reason to look at jurors without having to say what is your political philosophy and those kinds of things to make a decision. That is one of the things we have to look to.

## TIMOTHY ROY MALLARD

[He] was struck for the reason of the mustache. He had sun glasses [sic] on in court. He's unemployed.[6] At least those characteristics we didn't feel made him a good prospect for what we would think of as conservative state's minded juror.

## SANDRA MAYFIELD DAVIS

"She's the one who indicated she knew part of the defendant's family."

## EDITH MAYFIELD WILSON

The prosecutor testified that Wilson stated on voir dire examination that "she knew Dr. Gonzalez from a prior criminal trial." Mr. Worthington further testified that following the voir dire examination and before he struck Wilson he "went upstairs [to the District Attorney's office] ... to try to find out if anybody knew Ms. Wilson." Worthington stated that nobody recognized Wilson as being a prior State's witness, so that left me not knowing whether she was a friend of someone who had been tried before, without her knowing which trial it was, what her role in the trial was. I didn't feel at that point we could keep her on the jury where maybe she had been a witness for a criminal defendant in the past or related in some manner to a defendant who had been through trial before.

On cross-examination Worthington, when questioned about the State's challenge of Wilson, stated, "I didn't know how she knew Dr. Gonzalez. For all I know one of her family members and Dr. Gonzalez came in and testified 'Yes, it was the murder bullet from her family member's weapon who killed him.'"

Further cross-examination by defendant's counsel, together with questions by the court, establishes that the prosecutor used charts of the jurors to facilitate identification of each individual panel member. The chart provided a square for each juror, conformed to both the number of seats and the number of rows of seats in the courtroom. Worthington testified that he made shorthand notes to each square to indicate the juror's age, marital status, etc. He also stated that he identified black jurors by drawing a diagonal line across the top left corner of the square, thusly ◲

At the close of the *Batson* hearing, the trial court reserved its ruling on Lewis' *Batson* motions and impaneled the petit jury, whereupon opening statements were presented by counsel and the State's first witness was called. The case was recessed until 9:00 on July 14, 1987. On that date the trial court overruled Lewis' motions to quash the venire and for mistrial.

At the outset of our discussion of Lewis' first point of error, we observe that while the trial court conducted a *Batson* hearing, following which he overruled Lewis' mo-

---

5. The white juror, Joseph L. Phillips, had both a beard and a mustache.

6. The jury information sheet revealed that Mallard was unemployed.

tions, he did not reduce his pertinent findings of fact and conclusions of law to writing as suggested by *Henry v. State*, 729 S.W.2d 732, 737 (Tex.Cr.App.1987), and as directed by the court in *Keeton v. State*, 724 S.W.2d 58, 66 (Tex.Cr.App.1987) (*Keeton I*). Nevertheless, since the trial court conducted a proper hearing in which the prosecutor testified and gave his explanations for each challenge as contemplated by *Batson*, we are of the opinion that the trial court's ruling on Lewis' *Batson* motions constitutes an implied finding that none of the State's six peremptory challenges in this case were exercised by the State on the basis of the venirepersons' race as denounced in *Batson*. Hence, rather than abating the appeal and ordering the trial judge to file written findings of fact and conclusions of law, we will proceed to determine the merits of the point on the sufficient record now before us.

Since *Batson* was delivered, the Court of Criminal Appeals has delivered several opinions setting forth the proper standards and guidelines to be followed by trial appellate courts of this state in the determination and review of alleged *Batson* error. The latest published case is *Keeton v. State*, 749 S.W.2d 861 (Tex.Cr.App.1988) (*Keeton II*), and we now look to that case [7] to resolve the questions here presented.

In *Keeton II*, our Court of Criminal Appeals adopted the "conceptual analysis" of *Batson*, which is found in *State v. Antwine*, 743 S.W.2d 51 (Mo.1987), *Slappy v. State*, 503 So.2d 350 (Fla.Dist.Ct.App.1987), and *Ex parte Branch*, 526 So.2d 609 (Ala. 1987), copiously quoting from each case. The *Keeton II* court undertook to define the respective roles of the trial and appellate courts in dealing with claimed *Batson* error, relying principally on the last named three cases. The *Keeton II* court restated and followed, as it was bound to do, the reasoned procedures mandated by *Batson* and echoed by *Antwine*, *Slappy*, and *Ex parte Branch*. *See Batson*, 106 S.Ct. at 1723–1724.

It is clear that the "defendant must establish a prima facie case of discrimina-tion." That is, the defendant must present evidence that gives rise to a rebuttable presumption of racial discrimination by the State in the exercise of its peremptory challenges. If the defendant carries that burden, then the burden shifts to the State to rebut the presumption by a racially neutral explanation for each peremptory challenge exercised against a black venireperson. *Id.* at 1723; *Keeton II* at 867–868.

In this case, the undisputed fact that the State exercised six of its ten peremptory challenges to exclude blacks from the petit jury creates a rebuttable presumption, or prima facie case, that the challenges were racially motivated in violation of the Equal Protection Clause of the Fourteenth Amendment. *Keeton II* at 867. Therefore, our task is to determine, considering the evidence and the totality of the circumstances in the light most favorable to the trial court's implied findings, whether the record supports the trial court's findings. *Keeton II* at 870.

From our review of the record, we conclude that the trial court's rulings respecting the challenges of venirepersons McCullough, Mallard, and Davis are supported by explanations sufficient to rebut the presumption of purposeful racial discrimination. However, we conclude that the record provides no such support for the challenges against venirepersons Robinson, Hampton, and Wilson. In respect to these three prospective jurors, only Wilson was individually questioned on voir dire by the prosecutor. The only information solicited by the State from Wilson was that she had been involved in a "case" in which State witness Dr. Gonzalez had appeared as a witness. The prosecutor, after learning these facts, did not request an individual voir dire examination of the juror, or seek during voir dire additional factual information to establish the nature of the case, and Wilson's role therein. In short, the prosecutor did not ask Wilson any "meaningful questions" which could serve to support his later explanations of his challenge against her. The explanation given by the prosecu-

---

**7.** As well as to *Batson v. Kentucky*.

tor amounted to sheer speculation that the case in which Wilson had been involved *was a criminal case*, and that Wilson might have been related to an accused whose *conviction* might have resulted in part from Gonzalez' testimony for the State. We conclude that, absent a meaningful voir dire examination of Wilson regarding the character of the "case" and Wilson's role in the "case" in which Gonzalez appeared as a witness, the State's speculative explanation is pretextual, and is insufficient to rebut the presumption of racial discrimination. *Keeton II* at 868.

■ Insofar as we can determine, the State did not individually question Hampton on voir dire examination and did not address any question to the panel requiring a response on Hampton's part. The State's explanation[8] for the strike against Hampton was that Hampton was deemed to be "more liberal minded" since he had a mustache, and it was the State's "fairly regular routine to strike jurors who [have beards and/or mustaches]." The record reveals, however, that a white venireman with a beard was not challenged. We conclude that the explanation for Hampton's strike was but a sham or pretext to avoid admitting racial discrimination. *Keeton II* at 868. Hence, the explanation is not sufficient to rebut the presumption of racial discrimination in the exercise of the challenge against him.

■ Finally, we examine the record in respect to the peremptory challenge of Helen Ware Robinson. Robinson was one of the prospective jurors who, in response to questions directed to the entire panel, indicated that she did not drink alcoholic beverages. Aside from that nonverbal communication, neither the prosecutor nor the defense counsel propounded any question requiring a response from Robinson. The prosecutor explained his challenge against her by saying,

> The only question with her was when she would grin and laugh at Mr. Goodwin. I don't know if she liked him or was laughing when the Judge was scolding him or

what her purpose was. At that point we don't have a choice to ask her any more questions so it is difficult to determine her intent except at that point we didn't feel we could leave her on the jury panel with that question.

Based on the totality of the circumstances present here, and particularly the fact that the State exercised six of its ten peremptory challenges to remove blacks from the jury, we conclude that the explanation of the State with reference to its strike of Robinson was a contrived pretext or sham and, therefore, insufficient to rebut the presumption that the State exercised the challenge against her based on her race. *Keeton II* at 868.

We sustain Lewis' first point of error, reverse the judgment, and remand the cause for a new trial.