Margarita SANCHEZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–89–00691–CR.

Court of Appeals of Texas,
Dallas.

Aug. 14, 1990.

**952**

Noel Portnoy, Dallas, for appellant.

Yolanda M. Joosten, Dallas, for appellee.

Before WHITHAM, OVARD and WHITTINGTON, JJ.

OPINION

OVARD, Justice.

Margarita Sanchez was convicted by a jury of unlawful possession with intent to deliver a controlled substance, to wit: cocaine. The trial court assessed punishment at twenty years' confinement. In two points of error, Sanchez contends that the trial court erred in failing to grant her motion to suppress certain seized evidence and in denying her a racially neutral jury. We affirm the trial court's judgment.

Detective W.D. Stout, working undercover, arranged to purchase fourteen ounces of cocaine from Sanchez. On November 30, 1988, Stout entered Sanchez's residence to consummate the deal. Stout was monitored visually and with a body microphone by a tactical squad led by Sergeant C.D. McCoy. While inside the residence, Sanchez handed Stout a sample of cocaine; Sanchez then opened her refrigerator to display the remainder of the agreed purchase amount. Stout left the residence under the auspices of obtaining the purchase money from his car. While outside, he visually signalled to the tactical squad that the narcotics were inside the residence. Based on the pre-arranged "bust" signals from Stout, the tactical squad entered Sanchez's residence, without Stout, and arrested her without a warrant. As McCoy passed Stout outside the residence, Stout told McCoy that the cocaine was in Sanchez's refrigerator. McCoy entered the residence, went directly to Sanchez's refrigerator, and seized the cocaine Stout had observed.

In her first point of error, Sanchez complains that the "refrigerator cocaine" was illegally seized without a search warrant. She argues that the trial court erred in overruling her motion to suppress the evidence and her trial objection to admitting the "refrigerator cocaine" into evidence. We disagree.

■ An officer may make a warrantless arrest when a felony is committed in his presence or within his view. *Gonzales v. State*, 638 S.W.2d 41, 44–45 (Tex.App.—Houston [1st Dist.] 1982, pet. ref'd); TEX. CODE CRIM.PROC.ANN. art. 14.01 (Vernon 1977). The record reflects that, after making a phone call to Sanchez, Stout, while in his undercover garb, went to Sanchez's house to complete the drug transaction. While inside the house, Sanchez showed Stout one gram of cocaine and then opened a refrigerator to reveal thirteen more grams of cocaine. At all times during this transaction, Stout wore a body microphone for the dual purpose of his protection as well as to convey verbal signals to the tactical squad, headed by McCoy, that a drug transaction was in progress. After observing the cocaine, Stout left Sanchez's house to get the purchase money and gave two more physical signals to the tactical squad that Sanchez possessed the cocaine which was the subject of the pre-arranged purchase. We determine that, based upon this evidence, the record sufficiently indicates that the offense of possession of cocaine with the intent to distribute was committed in Stout's presence. Therefore, pursuant to the statutory exceptions providing for warrantless arrests, no search or arrest warrant was necessary to arrest Sanchez. TEX.CODE CRIM.PROC.ANN. art. 14.01.

Our inquiry is not at an end, however, because Sanchez was not arrested by Stout, the officer in whose presence the offense was committed. Instead, a tactical squad, led by McCoy, conducted the actual arrest after listening to the entire drug transaction via Stout's body microphone as well as observing various physical signals from Stout. Additionally, before McCoy entered Sanchez's house, Stout told him that the majority of the cocaine was in the refrigerator. Case law is abundantly clear that when one officer, participating among a team of officers, observes the incriminating conduct of a defendant, the observing officer's knowledge, together with any information possessed by the team, can be collectively considered in determining whether probable cause to arrest exists. *See, e.g., Pyles v. State*, 755 S.W.2d 98, 109 (Tex.Crim.App.1988); *Willis v. State*, 669 S.W.2d 728, 730–31 (Tex.Crim.App.1984); *Woodward v. State*, 668 S.W.2d 337, 344 (Tex.Crim.App.1982) (op. on reh'g). Considering the aforementioned facts, we determine that the warrantless arrest of Sanchez was proper as based upon Stout's knowledge and observations, which were imputed to the tactical squad and McCoy. Consequently, we hold that Sanchez's motion to suppress was properly denied. Point of error number one is overruled.

In her second point of error, Sanchez contends that the trial court erred by denying her a racially neutral jury. Sanchez argues that the State peremptorily challenged jurors solely on the basis of race in contravention of the holding of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In her brief, Sanchez raises her challenge based upon the Sixth and Fourteenth Amendments to the United States Constitution as well as article 35.261 of the Texas Code of Criminal Procedure. However, at trial Sanchez raised her objection solely on the basis of article 35.261. Therefore, under Texas Rule of Appellate Procedure 52(a) and interpretive case law, Sanchez has waived her challenge based upon the Sixth and Fourteenth Amendments for failure to present those arguments to the trial court before raising them in this Court. *See, e.g., Willis v. State*, 785 S.W.2d 378, 385 (Tex.Crim.App.1989); *Washington v. State*, 771 S.W.2d 537, 543 (Tex.Crim.App.1989); *Cook v. State*, 741 S.W.2d 928, 939 (Tex.Crim.App.1987); TEX. R.APP.P. 52(a).

Sanchez asserts that the State eliminated two Mexican–American and seven black veniremembers solely on the basis of their race. To invoke the protection of *Batson,* a defendant must establish a prima facie case of purposeful discrimination by showing that:

1. he was a member of a cognizable racial group;

2. the prosecutor had exercised peremptory challenges to remove from the ve-

nire members of the defendant's race (peremptory challenges constitute a jury selection practice which permits those to discriminate who are of a mind to discriminate); and

3. the facts and any other relevant circumstances raise an inference that the prosecutor used peremptory challenges to exclude the veniremen on account of their race.

*Batson,* 476 U.S. at 96, 106 S.Ct. at 1723; *Keeton v. State,* 724 S.W.2d 58, 65 (Tex. Crim.App.1987) (en banc). Once the trial judge determines that a prima facie case has been established, the burden then shifts to the State to justify the use of its peremptory strikes with race-neutral justifications. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723; *Keeton v. State,* 749 S.W.2d 861, 862 (Tex.Crim.App.1988). In response to *Batson,* the Texas legislature enacted article 35.261 of the Texas Code of Criminal Procedure.[1] Article 35.261 is virtually identical to the requirements of *Batson* except that the article does not *explicitly* require racial identity, as does *Batson,* between the accused and the stricken veniremembers. Our research has revealed one case that intimates that perhaps article 35.261 *may* allow for a defendant to successfully challenge the striking of veniremembers of a different identifiable racial group than the defendant. *See Oliver v. State,* 787 S.W.2d 170, 173 (Tex.App.—Beaumont 1990, pet. granted). However, due to the state of the record before us, as discussed below, a harmonization of any subtle differences between the establishment of a prima facie case of discrimination under article 35.261 and *Batson* is not necessary.

■ We will first analyze the striking of the black veniremembers by the State. The record reflects that the State used seven out of its ten peremptory strikes to remove black veniremembers from the panel. In order to establish a prima facie case of racial discrimination under article 35.-261, a defendant must prove that he is a member of an identifiable racial group. TEX.CODE CRIM.PROC.ANN. art. 35.261(a) (Vernon 1989). The trial court stated, before making its ruling on the *Batson* article 35.261 motion: "[A]ctually, there is no evidence in the record, by way of proof as such, of the Mexican–American race of the Defendant." Additionally, the trial court announced, in reference to the black veniremembers who were struck:

THE COURT: The Court will first rule that I'm not certain how a Batson will go. The Court—I am not aware of the Batson matter being both for members of other minorities. There may be a question of their rights under another theory to serve in juries. I'm talking about in regard—but as it affects the Defendant in this case, the Court feels that only those persons that are of Mexican American descent will be available to detest [sic] that. I'm talking about under the Batson rule. So the Court will grant that, that the Court will not entertain a motion based on the exclusion of those persons who are black in this cause. Overrule the motion as to those strikes.

1. Article 35.261 of the Texas Code of Criminal Procedure provides:

(a) After the parties have delivered their lists to the clerk under Article 35.26 of this code and before the court has impanelled the jury, the defendant may request the court to dismiss the array and call a new array in the case. The court shall grant the motion of a defendant for dismissal of the array if the court determines that the defendant is a member of an identifiable racial group, that the attorney representing the state exercised peremptory challenges for the purpose of excluding persons from the jury on the basis of their race, and that the defendant has offered evidence of relevant facts that tend to show that challenges made by the attorney representing the state were made for reasons based on race. If the defendant establishes a prima facie case, the burden then shifts to the attorney representing the state to give a racially neutral explanation for the challenges. The burden of persuasion remains with the defendant to establish purposeful discrimination. (b) If the court determines that the attorney representing the state challenged prospective jurors on the basis of race, the court shall call a new array in the case.
TEX.CODE CRIM.PROC.ANN. art. 35.261 (Vernon 1989).

From the trial court's comments on this matter, it is arguable that Sanchez failed to establish that she was a member of an identifiable racial group, based solely upon her surname. Even if she did establish this first prong of article 35.261, Sanchez failed to establish, in reference to the black veniremembers who were struck, that the attorney representing the State exercised peremptory challenges for the purpose of excluding persons from the jury on the basis of their race, and that Sanchez offered evidence of relevant facts that tend to show that challenges made by the attorney representing the State were made for reasons based on race. Because we hold that Sanchez failed to establish a prima facie case of racial discrimination by failing to satisfy the second and third prongs of article 35.261, we hold that the trial court properly denied Sanchez's *Batson* article 35.261 motion regarding the black veniremembers who were struck.

Regarding the two Mexican–American jurors who were struck, Gonzalez and Rafael, the following exchange took place between them and the attorney for the State, Mr. Adams:

MR. ADAMS: Mr. Gonzalez, your occupation is you draw maps. Is that it?

MR. GONZALEZ: No, no.

MR. ADAMS: What does that mean, lithographer?

MR. GONZALEZ: I'm a printer.

MR. ADAMS: Do you have any questions about anything I have discussed?

MR. GONZALEZ: No, nothing.

MR. ADAMS: You hesitated a little bit. You looked down. Watching all your nonverbal cues.

MR. GONZALEZ: Yeah, I know. You are trying to read me. No.

.     .     .     .     .

MR. ADAMS: Mr. Rafael?

MR. RAFAEL: Right.

MR. ADAMS: Did I say that right?

MR. RAFAEL: Yes.

MR. ADAMS: You said something a minute ago. What was that about?

MR. RAFAEL: Okay. Well, I was a juror in a case two years ago, I guess, awhile back, and whether this guy was crazy or not.

MR. ADAMS: Competency hearing?

MR. RAFAEL: Yeah, yeah.

MR. ADAMS: And is is [sic] there anything about that that would prevent you from being fair and impartial in this case?

MR. RAFAEL: No.

MR. ADAMS: Do you have any questions about anything else?

MR. RAFAEL: No, sir.

The record reflects some ambivalence on the part of the trial court in determining whether Sanchez established a prima facie case of racial discrimination. Before requesting race-neutral justifications from Mr. Adams, the trial court stated:

THE COURT: I'm just not aware. That is the reason—I'm not trying to delay or to go into this. All I'm saying is the Court is of the impression Batson requires that there be some neutral reason stated for the exclusion of a minority other than on the basis of race, upon the objection being made. I'm not at this point prepared to make a general ruling on that, there has been any systematic exclusion.

I think for the purpose of this hearing what the Court would like to do is to go ahead and ask the State to state for the record its reasons for excusing the two *apparently* Mexican American members who were struck.

(Emphasis added.) In response to the trial court's request for race-neutral reasons for striking veniremembers Gonzalez and Rafael, Mr. Adams responded:

MR. ADAMS: I'll be happy to do that for the Court. I struck Mr. Gonzalez because, as the Court saw, I spoke to each and every person on the jury panel. When I spoke to him, he hesitated in his

answers to me, and I don't know if it was my personality or what, but I didn't get a good feeling from him when I spoke to him, asked about his occupation as a lithographer, whatever. Seemed to be a little friction there. Just had a bad feeling, gut feeling about him that had nothing to do whether he was Hispanic or not. Another person on the panel who I had a similar feeling was Ms. Frazier. Was like–like a good State's juror as far as what my idea of that is. Husband, doctor, so forth; urologist. Seems like she would be a good person. But again, I don't know if that was that area of the room, but those two people were two that I recall. There may have been more. Just didn't sit well with me. Didn't have anything to do with them being Hispanic.

As far as Mr. Rafael, the reason I struck him is I [pay] [sic] a lot of attention to how people fill out their jury cards. Two things that bothered me about him is, first of all, he didn't fully fill out his card. I guess he's not married. He didn't put his age. That bothers me when people don't fill out those cards fully. But the main reason is the way he spelled religious preference. I guess that is Christian. He put Criston, C-r-i-s-t-o-n. Whenever people misspell things like that on their jury cards, and they have some type of job working for Liquid Spring or whatever, some type of manual job, that bothers me as to whether or not they would make a good juror, and that is the reason I struck him. And I would point out to the Court, when I did strike him, I didn't have a perception one way or the other as to whether or not he was Hispanic as far as his first two names. Especially his middle name doesn't look like Spanish to me. I don't know if he's Hispanic or not. But that wasn't a motivation. So I don't know anything beyond that N-e-s-s-i-m (spelling) looks like Arabic or something to me. That is the reason I struck those two.

We note that a veniremember's antagonism toward a prosecutor, as well as misspelling certain words on juror information cards, have been held to be race-neutral justifications for striking veniremembers. *See Levy v. State*, 749 S.W.2d 176, 178 (Tex.App.—Houston [14th Dist.] 1988, pet. ref'd); *Rice v. State*, 746 S.W.2d 356, 357 (Tex.App.—Fort Worth 1988, pet. ref'd) (op. on reh'g). We additionally note that various body language signals and nonverbal cues, which may be readily observed at the trial level, are not as ascertainable from a cold, silent record presented on appeal. *See* S. HAMLIN, WHAT MAKES JURIES LISTEN, 423–58 (1985).

■ The record presents a poor attempt to establish the racial identity between Sanchez and veniremembers Gonzalez and Rafael. The trial court noted, and we agree, that the race or ethnic origin of a defendant or veniremember cannot be conclusively proven for purposes of a *Batson* article 35.261 hearing based solely upon a person's surname. A defendant complaining of error at the trial court level has the burden to present a record to the appellate court which demonstrates such error. *See, e.g., Webb v. State*, 760 S.W.2d 263, 276 n. 19 (Tex.Crim.App.1988); *Jones v. State*, 742 S.W.2d 398, 401 n. 4 (Tex.Crim.App. 1987); TEX.R.APP.P. 50(d). We hold that, based upon Sanchez's poor effort in establishing a record which exhibits the racial identity of Sanchez, Gonzalez, and Rafael, as well as the State's valid, race-neutral justifications for striking Gonzalez and Rafael, the trial court properly denied Sanchez's *Batson* article 35.261 motion regarding the allegedly Hispanic veniremembers.[2] Point of error number two is overruled.

The trial court's judgment is affirmed.

---

**2.** The record reflects that, at most, five allegedly Hispanic veniremembers were available to serve

on the jury. Of those five, two were struck by the State, one was struck by the defense, one was struck by both the State and the defense, and one actually served on the jury.