IN THE COURT OF CRIMINAL APPEALS

OF TEXAS






NO. AP-76,452






GARLAND B. HARPER, Appellant


v.


THE STATE OF TEXAS, Appellee






ON DIRECT APPEAL 

FROM THE 182ND JUDICIAL DISTRICT COURT, 

HARRIS COUNTY





 Womack, J., delivered the opinion for a unanimous Court.



 A jury convicted the appellant of capital murder for killing three people during one
criminal transaction. (1) Pursuant to the jury's answers to the special issues, the trial court sentenced
the appellant to death. (2) Appeal to this court was automatic. (3) The appellant raises eight issues;
finding no error, we affirm. 

I. Background


 The appellant and Triska Rose began dating in the spring of 2008. Their relationship
progressed quickly, and the appellant moved in with Rose and her two daughters: Mya, aged
seven, and Briana, aged sixteen. The couple's relationship soon deteriorated as the appellant
became convinced that Rose was having an affair. (It was undisputed at trial that Rose was not
having an affair.) The appellant began following her, calling her obsessively, and dropping by her
place of employment without warning.

 On the evening of October 23, 2008, the appellant told Rose that he wanted to have sex.
Rose responded that she was tired, which the appellant took as further evidence of her
infidelities. Rose told him that she was sick of his accusations and wanted to end things. This led
to a fight in which Rose and Briana were somehow cut with a knife. Believing that he would go
to jail for domestic violence if the police were called, the appellant bound and gagged Rose and
the girls. He questioned them one at a time in order to "get to the bottom of this." After several
hours, Mya "admitted" that Rose had been cheating on him. This sent him into a jealous rage, he
later claimed. He stabbed Rose repeatedly and then strangled Briana with his hands, telling her
that she should not have sided with her mother. Finally, he strangled Mya with a phone charger.
Afterwards he went out "to think." When he returned he thought that Briana and Rose still might
be alive, so he slit their throats. 

 After the appellant cleaned up, he visited some friends. Later that morning, he called
Chandra Parson, a friend of the family, to say that Mya was ill and would not be coming over
before school as she usually did. When Parson asked about Rose, the appellant hung up. After
learning that Rose was not at work and Briana was not at school, Parson became worried. She
went by the apartment, called repeatedly, and filed a missing-person report with the police.
Finally, late in the afternoon, Parson and some other friends decided to enter Rose's apartment. 

 The friends broke in through the back door and found Rose, Briana, and Mya dead in the
master bedroom. All three were tied up. An autopsy showed that Rose was stabbed
approximately thirty-six times: her throat was slit, she had defensive wounds on her hands and
arms, cuts on her chest, stomach, and face. Briana died from strangulation, but she also had cuts
on her neck and chest, and three of her fingernails were broken. Mya had been strangled with the
cord of a phone charger. The medical examiner said that it would have taken about three minutes
for the children to die from asphyxiation.

 While the police were processing the crime scene, the appellant approached and said he
wanted to turn himself in. At the police station, the appellant confessed to the murders.

II. Future Dangerousness 


 In the appellant's first point of error, he argues that the evidence at trial was legally
insufficient to support the jury's finding of a probability that he would commit future criminal
acts of violence which would constitute a continuing threat to society. (4) Finding ample evidence
to support the jury's verdict, we overrule this point of error. 

 We assess the sufficiency of future-dangerousness evidence in the light most favorable to
the jury's findings. (5) We must determine whether any rational trier of fact could have found a
probability that the defendant would commit future criminal acts of violence which would
constitute a continuing threat to society, and we will reverse only if a rational jury would
necessarily have had a reasonable doubt about this probability. (6) 

 The special issue asks if "a defendant would constitute a continuing threat whether in or
out of prison without regard to how long the defendant would actually spend in prison if
sentenced to life." (7) In other words, the issue concentrates on "the character for violence of the
particular individual, not merely the quantity or quality of the institutional restraints put on that
person." (8) Some factors a jury may consider in determining future dangerousness include:

1. the circumstances of the capital offense, including the defendant's state of mind
and whether he or she was working alone or with other parties; 2. the calculated
nature of the defendant's acts; 3. the forethought and deliberateness exhibited by
the crime's execution; 4. the existence of a prior criminal record, and the severity
of the prior crimes; 5. the defendant's age and personal circumstances at the time
of the offense; 6. whether the defendant was acting under duress or the domination
of another at the time of the commission of the offense; 7. psychiatric evidence;
and 8. character evidence. (9) 


This list is not exhaustive. The jury is entitled to consider all the evidence at both the guilt and
punishment stages of trial. (10) 

 The circumstances of the offense and the events surrounding it can be sufficient to sustain
a "yes" answer when the crime is "so heinous as to display a wanton and callous disregard for
human life." (11) This was such a crime. After stalking Rose for a month or more, the appellant
stabbed her at least 36 times while her children were restrained nearby. The appellant then
stabbed Briana repeatedly, slit her throat, and strangled her for three minutes. Finally, the
appellant strangled Mya with a phone charger. This "infliction of multiple wounds at close range
indicates a wanton and callous disregard for human life" (12) and is legally sufficient to support the
jury's finding. 

 Further, the jury could find that the appellant would commit future acts of violence
because of his criminal history, which spans more than two decades. (13) The appellant's prior
criminal acts of violence were severe and unpredictable, occurring after periods of nonviolence
and apparent repentance. His victims included intimate partners and complete strangers. There
was no evidence that his violent tendencies would change.

 The evidence was legally sufficient to support a finding that the appellant would
constitute a future danger to society, whether in or out of prison. The appellant's first point of
error is overruled. 

III. Batson Challenge

 The appellant next argues that the State exercised a peremptory challenge in violation of
the Equal Protection Clause of the United States Constitution. (14) Finding no reversible error, we
overrule the appellant's second issue. (15) 

 In Batson v. Kentucky, the United States Supreme Court held that "the Equal Protection
Clause forbids the prosecutor to challenge potential jurors solely on account of their race ...." (16)
The Supreme Court set out the procedure for bringing a Batson objection in Purkett v. Elem:

 Under our Batson jurisprudence, once the opponent of a peremptory challenge has
made out a prima facie case of racial discrimination (step one), the burden of
production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial
court must then decide (step three) whether the opponent of the strike has proved
purposeful racial discrimination. (17)

 The ultimate burden of persuasion rests with the opponent of the strike (here the appellant) to
establish by a preponderance of the evidence that the strike was the product of the proponent's
purposeful discrimination. (18) 

 The appellant's only evidence of discrimination is the similarity of the challenged venire-member's "jury questionnaire evaluation score" and those of the accepted members. He does not
explain what this score represents or why it should be more important than the venire-members'
oral statements. The appellant also failed to preserve the jury questionnaires (on which he seems
to rely) which would tell us the racial composition of the venire and the racial composition of the
seated jury. (19) 

 The State argues (and the record reflects) that the challenged venire-member gave long-winded and non-committal answers to some questions while appearing opposed to the death
penalty during others. At one point she stated, "I'm pretty settled . I don't like to see people
die." Further, she expressed a strong belief in rehabilitation and the desirability of forgiveness.
These are race-neutral reasons for a peremptory challenge.

 The appellant has not met his burden. The trial court accepted the State's many race-neutral explanations for its peremptory challenge. On the record before us, we cannot say that
this decision was clearly erroneous. 

IV. The Appellant's Statement

 In points of error three, four, and five, the appellant challenges the trial court's admission
of a statement he made to police. Because his arguments do not comport with those made at trial,
they were not properly preserved and are overruled. 

 To be preserved for appellate review, a specific and timely complaint must have been
made on the record and ruled on by the trial judge. (20) The specificity requirement is met if the
complaint made at trial was clear enough for the trial judge to understand what the complaining
party wanted, why they were entitled to it, and to take corrective action. (21) We will not address an
objection on appeal if it varies from the objection raised at trial. (22)

 Before trial, the appellant filed six motions to suppress oral statements. Most were global
and did not specifically identify the basis for the challenge or even which statement was being
contested. (23) Nonetheless, the trial court held a hearing outside the presence of the jury to
determine the admissibility of the statement. At that hearing, the appellant's trial counsel argued
that the statement was inadmissible because it did not comply with the general requirements for
custodial interrogations. His entire argument read: 

 Judge, I'm taking the position that none of the statement is admissible pursuant to
Article 38.22 [of the Texas Code of Criminal Procedure]. It's an oral statement.
My reading of Herrera (24) is whether or not the accused felt like he was being
restrained or detained for purpose of the question on the case [sic]. My client
stated there was a guard outside the door. He felt like he had to obey the command
to talk with the officers. He was being restrained for the purpose of this
interrogation and I would agree that he was given his Miranda (25) warning as
required but, again, it does not satisfy the mandates of 38.22 and I'd request that
the statement in total be suppressed. 


 Now, before this court, the appellant abandons the custody claim and argues that the trial
court erred in admitting his statement because it was coerced. Specifically, he claims that he did
not voluntarily waive his right not to engage in self incrimination under the Fifth Amendment to
the United States Constitution and that this made the statement inadmissible under articles
38.21, (26) 38.22 § 5, (27) and 38.23(a) (28) of the Texas Code of Criminal Procedure. 

 Although both the appellant's argument at trial and his brief on appeal cite to article
38.22, they are not the same complaint. At trial, he argued only that the appellant was in custody,
and thus subject to the full protection of the statute. The only case discussed focused solely on
that issue. On appeal, the appellant argues that because he felt he could suffer a loss for failing to
answer questions, the statement was involuntary under federal law and inadmissible under both
Texas and federal law. Consequently, the appellant's appellate points were not properly
preserved. Points of error three, four, and five are overruled. 

V. Violation of "the Rule"

 In the appellant's final three points of error, he argues that the trial court erred by
allowing the State's rebuttal witness to testify despite having been present in the courtroom in
violation of Texas Rule of Evidence 614 ("the Rule"). (29) These points of error were not properly
preserved.

 Texas Rule of Appellate Procedure 33.1 requires that complaints at trial be timely made 
in order to be properly preserved for appeal. (30) The rationale of Rule 33.1 is that if objections are
raised before the trial court as soon as error becomes foreseeable, they may be addressed and the
error possibly corrected or avoided. (31) This ensures that litigants and the judicial system are not
burdened by appeal and retrial. When a party is excused from the requirement of objecting, the
results are the opposite. (32) The requirement of a proper objection extends to most types of errors,
including evidentiary mistakes, the denial of due process, and prosecutorial misconduct. (33)

 In the instant case, the appellant invoked the Rule at the beginning of his trial. Before the
punishment hearing began on October 8, 2010, the court inquired if there were any witnesses in
the courtroom who needed to be placed under the Rule. Both parties answered that there were
not. The first witness on October 13, 2010, was the defense's expert, Dr. Richard Dudley. During
his testimony, Dr. Dudley discussed a report prepared by Dr. Moellar, the State's expert. (34) The
appellant then offered into evidence, without objection, the hearsay report. During his testimony,
Dr. Dudley discussed parts of Dr. Moellar's report that were especially harmful to the State's
case. He also disagreed with Dr. Moellar's diagnosis of the appellant and opined that the
appellant was not exaggerating or attempting to mislead anyone about his mental-health
problems. 

 Over the course of the morning's testimony, the appellant's trial counsel noticed a man
passing notes to the prosecutors. At a midday break, trial counsel approached this man,
introduced himself, and inquired if he was Dr. Moellar. The man responded that he was. The
appellant's counsel did nothing with this information and resumed his examination of Dr.
Dudley. After the defense rested at the end of the next day, the State notified the court that it
wished to call Dr. Moellar as a rebuttal witness. Only then, after not objecting to Dr. Moellar's
presence in the courtroom for a full day and a half, did the appellant object that his testifying
would violate the Rule. 

 During a discussion at the bench, the appellant's trial counsel conceded that he knew Dr.
Moeller was in the courtroom, but he said he had assumed Dr. Moeller would not be testifying.
The following exchange occurred:

 The court: [The defense] knew who [Dr. Moeller] was because [they] referred to
him during Dr. Dudley's testimony.

 Defense counsel: But it's not our job. He wasn't excused from the Rule.


 At the hearing, it was uncontested that local practice often allowed experts to listen to
each other testify. After Dr. Dudley finished testifying, Dr. Moeller heard the testimony of three
lay witnesses. The Court allowed Dr. Moeller to testify despite acknowledging the Rule had been
violated.

 We hold that objecting was indeed counsel's job. Having been served with a witness list
which named Dr. Moeller as a testifying expert, (35) the appellant was on notice that a possible error
was occurring as soon as he discovered Dr. Moeller's presence. Had the appellant objected at that
point, when Dr. Moeller had heard only part of Dr. Dudley's testimony, the trial court could have
ruled on whether or not Dr. Moeller was essential to the State's case or instructed him to wait
outside. By failing to object, the appellant slept on his rights and prevented the system's curative
process. Points of error six, seven, and eight are overruled as untimely and not preserved. 

 The trial court's judgment is affirmed. 


Delivered October 10, 2012.

Do not publish.
1. See Tex. Penal Code § 19.03(a)(7)(A).
2. See Tex. Code Crim. Proc. art. 37.071, § 2(g).
3. See Tex. Code Crim. Proc. art. 37.071, § 2(h).
4. See Tex. Code Crim. Proc. art. 37.071, § 2(b)(1).
5. Coble v. State, 330 S.W.3d 253, 265 (Tex. Cr. App. 2010) (citing Berry v. State, 233 S.W.3d 847, 860
(Tex. Cr. App. 2007)) .
6. Id. 
7. Estrada v. State, 313 S.W.3d 274, 281 (Tex. Cr. App. 2010). The appellant urges this court to abandon
precedent and evaluate future dangerousness solely in terms of his likelihood to commit a crime within prison,
stressing his mostly non-violent record while incarcerated. We decline to do this. See Coble, 313 S.W.3d, at 269 ("It
is theoretically possible to devise a prison environment so confining, isolated, and highly structured that virtually no
one could have the opportunity to commit an act of violence, but incapacitation is not the sole focus of the
Legislature or of our death penalty precedents.").
8. Coble, 313 S.W.3d, at 268.
9. Keeton v. State, 724 S.W.2d 58, 61 (Tex. Cr. App. 1987). Accord, Coble, 330 S.W.3d, at 269, n.24. (This
list does not include characteristics of the prison system.).
10. Tex. Code Crim. Proc. art. 37.071, § 2(d)(1).
11. Dinkins v. State, 894 S.W.2d 330, 358 (Tex. Cr. App. 1995) (Evidence of the premeditated and brutal
murders of two women, including multiple gunshot wounds at close range, was sufficient to support an affirmative
answer to the future dangerousness special issue. "Character evidence uniformly favorable to" the defendant was
alone insufficient to mitigate the premeditation and brutality of the offense.); see also Fuller v. State, 253 S.W.3d
220, 231-32 (Tex. Cr. App. 2008)(An unprovoked nighttime attack against a family in which the parents were killed
and the children nearly killed was sufficient to sustain a future dangerousness finding.). 
12. Dinkins, 894 S.W.2d, at 360.
13. See Martinez v. State, 327 S.W.3d 727, 735 (Tex. Cr. App. 2010). 
14. See U.S. Const. amend. XIV, § 1. 
15. Snyder v. Louisiana, 552 U.S. 472, 477 (2008) (Deferential review is necessary for Batson challenges
because the trial judge is better able to evaluate the striking attorney's credibility.); see also Gibson v. State, 144
S.W.3d 530, 533-34 (Tex. Cr. App. 2004).
16. 476 U.S. 79, 89 (1986).
17. 514 U.S. 765, 767 (1995).
18. Watkins v. State, 245 S.W.3d 444, 447 (Tex. Cr. App. 2008).
19. The appellant made a record of the fact that when the State struck the contested venire-member, it had
used half of its exercised-peremptory strikes against African-Americans. The record does not reflect the racial
composition of the six accepted members (the races of two were not read into the record), the reasons for the other
strikes against African-Americans, or the racial breakdown of the later seated jurors.
20. Tex. R. App. P. 33.1. 
21. Lovill v. State, 319 S.W.3d 687, 691 (Tex. Cr. App. 2009); Pena v. State, 285 S.W.3d 459, 464 (Tex. Cr.
App. 2009).
22. Lovill, 319 S.W.3d, at 691; Euziere v. State, 648 S.W.2d 700, 703-04 (Tex. Cr. App. 1983).
23. Only two motions identified by date the statement which the appellant sought to exclude, and they did not
refer to the one questioned on appeal. None were ruled on. See Tex. R. App. P. 33.1 (Complaints on appeal must
have "sufficient specificity to make the trial court aware of the complaint" and must be ruled upon.); Swain v. State,
181 S.W.3d 359, 365 (Tex. Cr. App. 2005) ("Global" motions containing little more than citations to constitutional
and statutory provisions are insufficient to preserve error on appeal.). 
24. Herrera v. State, 241 S.W.3d 520 (Tex. Cr. App. 2007) (Jail inmate did not meet his burden of showing
he was "in custody" for purposes of Miranda and Texas Code of Criminal Procedure article 38.22 when questioned
about an incident unrelated to the crime for which he was imprisoned.).
25. Miranda v. Arizona, 384 U.S. 436 (1966). 
26. Tex. Code Crim. Proc. art 38.21 ("A statement of an accused may be used in evidence against him if it
appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter
prescribed.").
27. Tex. Code Crim. Proc. art 38.22, § 5 ("Nothing in this article precludes the admission of a statement
made by the accused in open court at his trial, before a grand jury, or at an examining trial in compliance with
Articles 16.03 and 16.04 of this code, or of a statement that is the res gestae of the arrest or of the offense, or of a
statement that does not stem from custodial interrogation, or of a voluntary statement, whether or not the result of
custodial interrogation, that has a bearing upon the credibility of the accused as a witness, or of any other statement
that may be admissible under law.") The appellant does not make clear how this statute relates to his claim. 
28. Tex. Code Crim. Proc. art 38.23(a) ("No evidence obtained by an officer or other person in violation of
any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of
America, shall be admitted in evidence against the accused on the trial of any criminal case. In any case where the
legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that
the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall
disregard any such evidence so obtained.). 
29. Tex. R. Evid. 614 ("At the request of a party the court shall order witnesses excluded so that they cannot
hear the testimony of other witnesses, and it may make the order of its own motion...").
30. Tex. R. App. P. 33.1. 
31. Moore v. State, 295 S.W.3d 329, 333 (Tex. Cr. App. 2009).
32. Young v. State, 137 S.W.3d 65, 69 (Tex. Cr. App. 2004).
33. Clark v. State, 365 S.W.3d 333, 339 (Tex. Cr. App. 2012).
34. The appellant had been served with notice that the State intended to call Dr. Moellar as a witness.
35. Pope v. State, 207 S.W.3d 352, 360 (Tex. Cr. App. 2006) ("[O]nce a party designates a particular person
as an expert that he may use as a witness at trial, that person is no longer a 'consulting' expert, he is a 'testifying'
expert[.]").