

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. WR-78,439-02

### EX PARTE DAMON WEST, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### FROM DALLAS COUNTY

NEWELL, J., delivered the opinion of the Court in which KELLER, P.J., and ALCALA, J., joined.

## O P I N I O N

A jury convicted Applicant of engaging in organized criminal activity for his role in the "Uptown burglaries" in Dallas and sentenced him to 65 years in prison. In his application for writ of habeas corpus, Applicant alleges that he is entitled to a new punishment hearing based upon trial counsel's deficient performance during both the guilt-innocence and punishment phases of trial.[1] While we agree that Applicant's trial counsel failed to adequately investigate and present mitigating

---

[1] This is actually Applicant's second application for post-conviction relief, but we dismissed his first application on his own motion.

evidence, Applicant has failed to demonstrate a reasonable probability that the result of the punishment proceedings would be different. Consequently, we deny Applicant habeas corpus relief.

*Background*

Applicant was the ringleader of a group that burglarized dozens of apartments and condominiums in and around the Uptown area of Dallas in 2007 and 2008. Applicant, and his cohorts, broke into each of their victims' homes by using a drill to move the lock's bolt just enough to allow Applicant to pry the door open. A twenty-three-year veteran of the Dallas police force testified that, since the "usual" way was to kick a door in, Applicant's method was particularly unique and he had not seen another burglary performed the same way since. The burglaries were timed to coincide with periods in which the residents were out of town for several days, thereby giving the burglars time to clear out property.

Thirteen burglary victims testified to the methods and practices of Applicant and his cohorts at trial. The testimony revealed that the group would ransack the homes and apartments looking for, and taking, only valuable items. The group would stay for a period of days in each residence: sleeping in beds, eating food, drinking liquor and otherwise taking advantage of the home's missing owner. When they left, the residences would be in upheaval with property strewn everywhere, food on the floor, cigarette ashes everywhere, doors and cabinets open,

and furniture upturned. Applicant and his friends stole various items from the victims including clothing, lingerie, credit cards, personal IDs, and jewelry. One victim testified that unauthorized credit-card charges had been incurred; another victim stated that his identity was used to open a cell-phone account and rent an apartment.

Applicant and his accomplices had no regard for even the most sentimental or important personal items in the victims' homes. One victim, an off-duty police officer, was robbed of his service weapon, bulletproof vest, and badge. Another, whose fiancé was killed in military service, came home to find her engagement ring stolen out of her safe and his dog tags, medals, letters and military papers shuffled through and strewn about. A victim who had his garage burglarized testified that several boxes of family videos and children's artwork had been stolen.

A police raid of a "safehouse" connected Applicant to a total of fifty-one burglaries. Within the safehouse, officers found an extensive amount of property such as power tools, computers, clothing, guns, televisions, and electronics. It took multiple officers to move and catalog the property, and one officer testified at trial that there was so much stolen property that there wasn't enough room for it at the police property room. Despite the volume of property at the safehouse, that was not all of it. Applicant had given away many pieces of stolen property to those who

have helped with his criminal endeavors.

Police arrested Applicant after responding to a call from an apartment complex about a burglary in progress. When the police arrived, they found Applicant in a stolen SUV attempting to leave the complex. Police recovered several suspicious items from the SUV, including a bag full of garage-door and gate openers, multiple laptop computers, women's clothing and accessories, and a cordless drill. Applicant also made phone calls instructing people to "move things" while he was in jail. Police were able to identify other members of Applicant's group through security-camera footage, witness interviews, and evidence seized pursuant to multiple search warrants. The execution of these search warrants also resulted in the recovery of some of the property stolen in the burglaries.

After his arrest, Applicant showed little remorse as he bragged that there were other burglaries that had not been tied to him and attempted to persuade his two brothers, Grayson and Brandon West, to assist him in keeping his undiscovered stolen property away from the police. In jail calls to his brothers, he would laugh about his ability to evade police detection and even recounted a story in which he had successfully removed an ankle monitor. Applicant also consulted with Brandon over the phone regarding what to do with the stolen goods that the police had yet to find, asking Brandon if he and Grayson would be able to move the items for him.

The record suggests that Brandon was agreeable to assisting Applicant, however, it is unclear whether Brandon actually did move any items for Applicant.

Applicant also boasted to Brandon that he had sent a harassing email to his ex-girlfriend, Pamela Evans, using another inmate's PIN number to avoid tracing it to him. Evans had previously been the victim of numerous instances of physical and emotional abuse at the hands of Applicant. Applicant would call her names like "dumb whore" and "dumb bitch" and escalate to "extremely violent" acts involving pushing, "body slams" and pulling of her hair. Applicant was arrested for assault after one instance and, from jail, he threatened her until she agreed not to pursue a protective order. After he was out, Applicant violated the no-contact orders in place by calling Evans and showing up at her workplace to harass her. After his arrest on the burglaries, he phoned her from jail and asked her to lie and tell officers that he had never given her stolen property and they had not seen each other.

Applicant was convicted of engaging in organized criminal activity and a jury imposed a sentence of 65 years in prison and a $10,000 fine. Applicant petitioned for a new punishment hearing, arguing that trial counsel had provided ineffective assistance of counsel. We remanded this case for an evidentiary hearing and the trial court made findings of fact and conclusions of law as to Applicant's ineffective

assistance of counsel claim. The trial court recommended that relief be granted.[2] We disagree and hold that Applicant's Sixth Amendment right to effective assistance was not violated during the punishment stage of his trial.

### *Applicant's Legal Representation*

In October 2008, Applicant and his family hired Edwin Sigel to defend Applicant.[3] Prior to his work on Applicant's case, Sigel had worked for the United States Department of Justice, for a former Assistant United States Attorney, and as a federal defense attorney. With the exception of a brief career in the banking and securities industry, Sigel had been practicing criminal law since he was licensed in 1959.

Sigel received extensive discovery from the State in Applicant's case. Upon the court's approval, Sigel selected an investigator, Cliff Jenkins, to assist him in investigation of the evidence he had received. Jenkins's job was to review the discovery, make any necessary investigations, and assist in preparing Sigel and

---

[2] The trial court recommended granting relief on the basis that Sigel's conduct constituted ineffective assistance. Absent from the findings of fact and conclusion of law, however, is any discussion related to the second prong of *Strickland v. Washington*, whereby there must be facts demonstrating a reasonable probability that, but for the ineffective assistance, the result of the proceedings would have been different. 466 U.S. 668 (1984). In cases, such as this, in which "we determine that the trial judge's findings and conclusions that are supported by the record require clarification or supplementation, we may exercise our judgment and make findings and conclusions that the record supports and that are necessary to our independent review and ultimate disposition." *Ex parte Reed*, 271 S.W.3d 698, 728 (Tex. Crim. App. 2008).

[3] The exact date that Applicant retained Sigel is unknown as Sigel was unable to locate Applicant's file upon request from Applicant's post-conviction counsel. Sigel did not provide a reason for the file's disappearance.

Applicant for trial. Sigel stated at the writ hearing that, because Jenkins was closer in age to Applicant, Jenkins would often have more success in communicating with Applicant than Sigel would.

When Sigel visited Applicant in jail, Applicant's mannerisms and conversation caused Sigel to suspect that Applicant was not competent to stand trial[4] and that Applicant had been using drugs while in jail. Given the magnitude of the evidence against Applicant, as well as his interactions with Applicant, Sigel determined that the most viable defense would be to portray Applicant to the jury as a man who, although inherently good, was suffering from mental instability brought on by drug use, which caused him to commit the burglaries. Siegel's entire defense strategy was based upon this theory.

Approximately two months before trial, Sigel underwent surgery. On the advice of Cliff Jenkins, Applicant and his family hired a second attorney, Karen Lambert, to assist Sigel in Applicant's defense. At the time of her retention, Lambert had practiced criminal law in Dallas for over twenty-five years, and she had tried over three-hundred cases to verdict.

Lambert immediately began reviewing the evidence. Sigel had previously filed a motion to suppress, but she advised Sigel to file a second motion due to the

---

[4] Sigel filed a motion to determine Applicant's competency to stand trial. The trial court ultimately determined that Applicant was competent after reviewing a court-ordered psychological evaluation.

number of search warrants involved in the case, which Sigel did.[5]   At the writ hearing, Lambert testified that Sigel did not allow her to make any major trial decisions and would not discuss his trial strategy with her.   However, Sigel regarded Lambert as his co-counsel, and the record supports this assertion. Lambert filed pre-trial motions, participated in voir dire, made objections during trial, cross-examined witnesses, and made an opening statement at the commencement of the punishment stage of the trial.

During the punishment stage of trial, the defense team put forth a number of mitigation witnesses including: Applicant's mother and father; former Texas Land Commissioner and gubernatorial candidate Garry Mauro, with whom Applicant had worked in 2004; Arthur Schecter, a Houston attorney and a former ambassador to Bermuda under President Clinton; Applicant's priest, Father Don Donahugh; Mike Owens, Applicant's high school football coach; and Bill Maddox, Applicant's godfather and former editor of the Port Arthur News.  Sigel also presented expert testimony from doctors who had done extensive testing on Applicant and determined that he was sexually molested by a babysitter at age nine, that he suffered from attention-deficit disorder, and that he was not a sociopath or psychopath.  Applicant's experts opined that Applicant needed intensive drug

---

[5] The motion was ultimately denied.

treatment.

Ms. Lambert presented closing argument on Applicant's behalf at punishment. She argued the defense theory that Applicant was a good person who, without the influence of drugs, could be rehabilitated. In response, the State vehemently argued that Applicant was a hardened criminal with no possibility of reform. In support of this, the State asserted "[Defense counsel] brought you pictures, they brought you politicians. They want to awe you with the title of these people so that you will look past what they were really telling you when none of them have had any kind of quality interaction with him for the last five years." Ultimately, the jury returned a verdict sentencing Applicant to 65 years in prison.

### *Ineffective Assistance of Counsel*

Under *Strickland v. Washington*, Applicant must meet the two-pronged test set out by the United States Supreme Court in order to prevail on a claim of ineffective assistance of counsel. *Hernandez v. State*, 988 S.W.2d 770, 774 (Tex. Crim. App. 1999). First, Applicant must show that counsel's assistance fell below an objective standard of reasonableness under prevailing professional norms. *Thompson*, 9 S.W.3d at 812; *Hernandez v. State*, 726 S.W.2d 53, 55 (Tex. Crim. App. 1986). Second, Applicant must affirmatively prove prejudice by demonstrating through evidence firmly founded in the record that, but for the attorneys' unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. *Jaubert v.*

*State*, 74 S.W.3d 1, 9 (Tex. Crim. App. 2002). On both prongs of this test, Applicant bears the burden of proving his ineffectiveness claim by a preponderance of the evidence. *Thompson*, 9 S.W.3d at 813.

Judicial scrutiny of counsel's performance in such cases must be highly deferential because it is too tempting for a defendant to second-guess counsel's assistance after conviction or an adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. *Id.* Because such an evaluation is inherently difficult, this Court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and require that a defendant overcome that presumption. *Id.* As we have repeatedly noted, an accused is not entitled to errorless counsel, therefore, we do not look at a counsel's actions in isolation of the entire record. *Frangias v. State*, 450 S.W.3d 125, 136 (Tex. Crim. App. 2013).

Applicant claims that he was assessed a sentence far greater than he would have been but for counsel's errors at both phases of trial. He claims that the totality

of Sigel's representation, from both the guilt-innocence and punishment stages of trial, entitle him to a new punishment hearing. We will address Applicant's claims regarding counsel's representation during the guilt-innocence phase of the trial because all of the evidence adduced during that phase of the trial was properly before the jury during punishment. *See Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). Also, we have consistently held that an appellate court must look to the totality of the representation in evaluating the effectiveness of counsel. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). The "totality of the representation" necessarily includes actions taken by counsel during pre-trial proceedings, guilt-innocence and punishment. Applying the standard presented in *Strickland v. Washington*, we hold that Applicant is not entitled to a new trial as to punishment.

### Applicant's Decision to Plead "Not Guilty"

At the outset, Applicant contends that Sigel was ineffective in failing to fully investigate and inform Applicant of the law of engaging in organized criminal activity and the overwhelming evidence of Applicant's guilt in the State's possession. Applicant claims that, had he known the evidence against him was so overwhelming he would not have persisted in his "not guilty" plea.

Relatively recently, the United States Supreme Court addressed a situation in which a defendant rejected a plea bargain offer and pleaded "not guilty" on the

erroneous advice of counsel. *Lafler v. Cooper*, 132 S.Ct. 1376 (2012). There, the defendant was charged with multiple offenses, and the State offered to dismiss two charges in exchange for a plea bargain on a charge of assault with intent to murder. *Id.* at 1383. Trial counsel advised the defendant to reject the offer because he erroneously believed that the prosecution would be legally unable to establish the intent to murder. *Id.* The defendant was subsequently convicted on all counts and received a minimum sentence that was three-and-a-half times greater than the one he would have received had he accepted the plea bargain. *Id.*

Rather than determine whether the rejection of the plea bargain was knowing and voluntary, the Court applied the *Strickland* standard for ineffective assistance of counsel. *Id.* at 1390.[6] The Court acknowledged that, under *Hill v. Lockhart*, a defendant must show a reasonable probability that, but for counsel's errors, the defendant would not have pleaded guilty and would have insisted on going to trial. *Lafler*, 132 S.Ct. at 1384-85 (citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)). Yet when the prejudice alleged is having to stand trial rather than serve a particular sentence,

---

[6] When a defendant enters a plea of guilty, he necessarily waives a series of fundamental constitutional rights, including a trial by jury, the right to confront one's accusers, the right to present witnesses in one's defense, the right to remain silent, and the right to be convicted only by proof beyond a reasonable doubt. *Bitterman v. State*, 180 S.W.3d 139, 141 (Tex. Crim. App. 2005); *see also United States v. Mezzanatto*, 513 U.S. 196, 209-10 (1995) ("The plea bargaining process necessarily exerts pressure on defendants to plead guilty and to abandon a series of fundamental rights . . . ."); *Ex parte Cox*, 482 S.W.3d 112, 117 (Tex. Crim. App. 2016) ("In order to protect the constitutional rights of the defendant, there are strict federal and state requirements regarding the defendant's ability to enter into such an agreement, including a requirement that, if a defendant's plea is made based on a promise given by the state, the state must keep its promise or the plea will be rendered involuntary."). In contrast, a defendant who insists upon pleading "not guilty" does not waive any of these rights by virtue of his or her plea.

the defendant must show a reasonable probability that a plea offer would have been presented to the trial court; that the court would have accepted its terms; and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that were in fact imposed. *Lafler*, 132 S.Ct. at 1385.

This Court has repeatedly addressed situations in which a guilty plea is considered involuntary due to the ineffective assistance of counsel. For example, in *Ex parte Imoudu*, we held that a defendant's plea of guilty was the result of ineffective assistance because trial counsel had failed to investigate the possibility that the defendant was insane at the time of the offense. 284 S.W.3d 866, 869-70 (Tex. Crim. App. 2009). We have also held, in line with United States Supreme Court precedent, that the failure to properly advise a defendant about the presumptively mandatory deportation consequences of his guilty plea amounted to ineffective assistance of counsel. *Ex parte Torres*, 483 S.W.3d 35, 46 (Tex. Crim. App. 2016). But we have not addressed whether trial counsel renders deficient performance by allowing a client to persist in a plea of "not guilty."

Before trial, Applicant was offered a plea bargain of 40 years. According to Sigel, Applicant refused the offer stating that he did not want to plead guilty. Applicant does not argue that trial counsel's ineffective representation prevented

this plea bargain from being presented to and accepted by the trial court. Neither

is there any indication that Sigel advised Applicant to plead not guilty. Instead,

Applicant contends that his decision to plead "not guilty" was erroneous because

Sigel failed to fully explain Applicant's right to plead guilty as well as the possibility

of a "slow plea," which co-counsel believed would have been the best option.[7]

Applicant also argues that Sigel did not fully understand the law regarding

engaging in organized criminal activity and represented to Applicant that the State's

evidence was weak, which, in turn, influenced Applicant to enter a plea of not

guilty.[8] Applicant seems to argue that his "not guilty" plea (and the corresponding

jury trial on the issue of guilt) prejudiced him during the punishment phase of the

trial.

We need not decide whether trial counsel's failure to insist upon a "slow plea"

of guilt amounted to deficient performance because, even assuming that it was,

Applicant cannot demonstrate that the proceedings would have been different if he

had chosen to plead guilty. Obviously, Applicant's guilty plea would not have

---

[7] The term "slow plea" appears to refer to the practice of pleading guilty before a jury to allow the jury to assess punishment. This is not a legally recognized pleading under the Code of Criminal Procedure. Rather, the colloquial name for this practice seems to have originated in the Dallas area. *See e.g. Williamson v. State*, No. 05-94-00065-CR, 1995 WL 81323 (Tex. App.–Dallas 1995, no pet.) (not designated for publication) ("Appellant specifically complains that his trial counsel recommended that appellant plead guilty before the trial court rather than make a 'slow plea' in front of a jury.").

[8] In other words, Applicant does not appear to argue that he is entitled to the forty-year plea-bargain. Rather, he argues that he is entitled to an entirely new punishment trial because a plea of guilty would have made his mitigation case at punishment more effective.

resulted in a different outcome in the guilt phase of the trial. Moreover, the record demonstrates that Applicant was in possession of a stolen vehicle full of items stolen from the homes that were burglarized by Applicant and his co-conspirators at the time of Applicant's arrest. Applicant was aware of his right to plead guilty and that the State had significant evidence against him. Applicant has failed to show that there is a reasonable probability the jury would have assessed a more lenient sentence had Applicant utilized a "slow plea" tactic rather than proceeding to trial. *Ex parte Cash*, 178 S.W.3d 816, 818-19 (Tex. Crim. App. 2005) (rejecting ineffective assistance claim because defendant failed to demonstrate beyond conjecture and speculation that the sentencing jury would have reached a more favorable penalty-phase verdict).

### Sigel's "Truth Defense"

Applicant also claims Sigel was constitutionally ineffective because he relied upon "a novel and unreasonable trial strategy" that Sigel referred to as the "truth defense."[9] This strategy simply consisted of being open and honest with the jury throughout trial, even if that resulted in the admission of unfavorable evidence during the guilt-innocence phase of trial. Sigel hoped that, by doing so, he would

---

[9] Also referred to by Sigel as a "nickel defense." Sigel explained the "nickel defense" as an effort to mitigate punishment, "In other words, keeping him from getting life we said maybe you'd get five years of probation or something like that. That was the nickname the 'nickel defense.'" It was to avoid the jury finding out all the negative evidence for the first time at punishment.

earn the jury's trust as well as ensure that the jury would not be surprised by hearing negative evidence at punishment. Sigel also thought this strategy would work towards portraying Applicant as a drug abuser who deserved probation and an opportunity to rehabilitate. Sigel urged Applicant to tell the truth and be himself, though Sigel admitted that he did not thoroughly explain his "truth defense" strategy to Applicant.[10]

While this strategy was clearly risky, we cannot agree that this strategy fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687. In its findings, the trial court agreed with Applicant that the "truth strategy" was unreasonable and constituted ineffective assistance of counsel. In doing so, it placed the most significance on the fact that Lambert testified that she would have made different strategic decisions at trial. But Sigel's trial strategy cannot be considered ineffective assistance of counsel simply because his co-counsel believed it to be a poor strategy in hindsight. The presumption that an attorney's trial strategy is reasonable cannot be rebutted simply because another attorney, even Applicant's co-counsel, would have used another strategy. *See Hawkins v. State*, 660 S.W.2d 65, 75 (Tex. Crim. App. 1983); *see also Morgan v. State*, 403 S.W.2d 150, 152 (Tex. Crim. App. 1966) (quoting *Williams v. Beto*, 354 F.2d 698 (5th Cir. 1965)) ("The practice of

---

[10] Sigel stated that the plan was always for Applicant to testify, however, in the middle of trial, Applicant decided against doing so without explanation.

law is an art as well as a science. As no two men can be exactly alike in the practice of the profession, it is basically unreasonable to judge an attorney by what another would have done, or says he would have done, in the better light of hindsight."). Additionally, while we have never directly addressed the validity of a strategy whereby defense counsel introduces favorable and unfavorable evidence in order to appear open and honest with the jury, other courts have found it to be neither a novel strategy nor a strategy that constitutes ineffective assistance of counsel. *See Varughese v. State*, 892 S.W.2d 186, 196 (Tex.App.–Fort Worth 1994, no pet.) (failure to object was part of a strategy to appear open and honest); *Baber v. State*, 931 S.W.2d 359, 362 (Tex. App.–Amarillo 1996, pet. ref'd.); *Huerta v. State*, 359 S.W.3d 887, 894 (Tex. App.–Houston [14th Dist.] 2012, no pet.). Consequently, Applicant has not demonstrated that Sigel's use of a "truth strategy" by itself fell below prevailing professional norms. Even assuming that it did, we cannot say without engaging in speculation that Applicant would have received a more lenient sentence at punishment had trial counsel employed a different strategy during the guilt-innocence phase of the trial. *Cash*, 178 S.W.3d at 818-19.

### *Sigel's Statements at Voir Dire Regarding Voluntary Intoxication*

Applicant also alleges that Sigel wrongly informed the venire members that voluntary intoxication was a legal defense under existing Texas law. Applicant's contention is not supported by the record. Sigel first informed the members of the

venire that they may receive an instruction from the trial judge "that evidence of involuntary intoxication…causes some sort of temporary mental insanity" and can be considered as a defense during the punishment phase of trial. Sigel then clarified that it is "not a defense, but it can be considered by the jury in mitigation of punishment." This is a correct statement of the law, however inartfully expressed. *See* TEX. PEN. CODE ANN. § 8.04(c). More importantly, even assuming that Sigel stated the law in a confusing and improper way, we find nothing in the record that indicates Applicant was prejudiced by Sigel's statement to the veniremen, particularly since neither the issue nor the law was raised again during trial. *See Cox v. State*, 389 S.W.3d 817, 820 (Tex. Crim. App. 2012) (second *Strickland* prong is not automatically satisfied "whenever a jury receives incorrect information"); *see also Williams v. State*, 622 S.W.2d 116, 119 (Tex. Crim. App. 1981) (defendant was not prejudiced by his defense counsel's failure to object to the trial court's misstatement of the law because no evidence was presented during trial raising the issue and "the appellant did not testify or call any witnesses on the issue.").

### *Incriminating Testimony Admitted During the Guilt-Innocence Phase of Trial*

As part of his complaint regarding trial counsel's performance during the guilt-innocence phase of the trial, Applicant argues that Sigel elicited harmful, aggravating testimony from the State's witnesses that would not have otherwise been admitted. Applicant contends that Sigel committed a number of errors, based

on his unpreparedness, that caused incriminating information to come out during the guilt-innocence phase of trial that harmed him during punishment. These errors include inviting testimony that Applicant's community-service papers were found inside a car full of items stolen from the burgled houses, as well as testimony that, upon his arrest, Applicant was found sweating profusely, high on methamphetamine, and with Viagra and methamphetamine in his pockets. Sigel also led a victim of one of the burglaries to tell the jury that he knew it was Applicant who stole from him because Applicant was found in possession of the victim's personal identifications. Additionally, when questioning the lead investigator, Sigel invited him to speculate that the reason Applicant stole women's underwear was to intimidate witnesses and that the reason no fingerprints were found on the weapons used in the burglaries was because Applicant had used gloves. Applicant also claims that, while questioning a witness who had failed to identify Applicant in a line up, Sigel nevertheless identified Applicant as the person who had committed the burglaries. Finally, Applicant argues that Sigel made Applicant look less sympathetic by eliciting testimony from an officer that Applicant had used his brother's vehicle during the burglaries.

We find no merit in Applicant's claims that Sigel's questioning, as part of his truth strategy, prejudiced Applicant during the punishment phase of his trial. The

testimony that Applicant's community service papers were found with the stolen items from victims' homes was immediately objected to by Applicant's co-counsel, Ms. Lambert. The trial court sustained and admonished the jury to disregard the testimony. *See Waldo v. State*, 746 S.W.2d 750, 754 (Tex. Crim. App.1988). Sigel stated at his writ hearing that the evidence regarding the methamphetamine and Viagra found in Applicant's pocket was elicited consistent with the trial strategy to show that Applicant had been motivated by drugs, not money, in committing the crimes. *See Ex parte Ellis*, 233 S.W.3d 324, 328, 331-35 (Tex. Crim. App. 2007) (introducing potentially damaging information before the jury did not amount to ineffective assistance where the evidence furthered the stated defense strategy).

Similarly, when explaining why he invited officer testimony about Applicant's motivation to intimidate victims and that Applicant might have used gloves to hide fingerprints, Sigel stated that he asked open-ended questions because he believed that Applicant's co-defendant "was a real criminal" and, in turn, his client was not. When asked by habeas counsel if the testimony regarding the gloves made Applicant look like "fledgling criminal or a fairly experienced one," Sigel responded "I don't know what it makes him look like. It's just the truth." While this may have been incriminating during the guilt-innocence phase of the trial, eliciting this

testimony nevertheless furthered trial counsel's strategy to appear forthcoming before the jury as to punishment. *See Ellis*, 233 S.W.3d at 335.

Additionally, Applicant claims that Sigel improperly identified Applicant as a guilty party even while eliciting testimony from a burglary victim that she could not identify Applicant as someone who had committed the burglary. However, Sigel's question did not identify Applicant as the person who committed the burglaries. Instead, his question to the witness was "Is it accurate to say that you did not–were not able to pick out the person that we know now to be Damon West out of that lineup?" The witness' response was that, indeed, she had not been able to. We find no error in eliciting this testimony as all it demonstrated was that one of the burglary victims could not pick Applicant out of a lineup. *Ortiz v. State*, 93 S.W.3d 79, 93 (Tex. Crim. App. 2002) (rejecting the defendant's ineffective assistance claim on the basis that counsel had allowed in harmful testimony because he failed to show that the evidence was inadmissible).

Similarly, Applicant contends that it was harmful for the jury to hear that the stolen items were found in Grayson West's car.[11] Again, this was part of trial counsel's strategy to appear open to the jury so the members of the jury would feel they were being told the entire story. *See Ex parte Niswanger*, 335 S.W.3d 611, 619

---

[11] One of the State's theories at trial was that Applicant's brother was another "victim" of Applicant's crimes in the sense that Applicant was attempting to implicate Grayson in the burglaries by asking him to move items out of the storage unit where the stolen goods were placed.

(Tex. Crim. App. 2011) (abrogated on other grounds by *Cornwell v. State*, 471 S.W.3d 458, 462 (Tex. Crim. App. 2015)) (recognizing a "strong presumption that counsel's conduct might be sound strategy"). Furthermore, as explained below, Applicant contends that Sigel should have called Grayson West to the stand at punishment so that Grayson could have testified on Applicant's behalf. This would have necessarily allowed this information to come forth at this point in the trial. Thus, even assuming Sigel's elicitation of such testimony fell below prevailing professional norms, Applicant has not shown a reasonable probability that the result of trial would have been different had he chosen to wait until punishment to elicit testimony that Applicant had used his own brother's car. *Strickland*, 466 U.S. at 692; *see also Sims v. State*, 273 S.W.3d 291, 294 (Tex. Crim. App. 2008) ("what is admissible as relevant to the punishment determination is no longer constrained by considerations of what is patently inadmissible at the guilt phase of trial").

Applicant also argues that Sigel: 1) questioned and called certain witnesses that advanced the State's theory that Applicant was a privileged, unremorseful athlete who had every advantage and did not deserve leniency; and 2) failed to make an opening statement in the punishment stage of Applicant's trial after telling the jury at the beginning of trial that he would do so. Neither allegation holds merit. Applicant fails to present any evidence or cite from any portion of the record that

shows Sigel advanced the State's portrayal of Applicant. *See Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002) (ineffective assistance of counsel claims must be firmly founded in the record, and that record must itself affirmatively demonstrate the alleged ineffectiveness.). Applicant's complaints about Sigel's failure to make an opening statement at punishment are equally unavailing. While Sigel did not make an opening statement at punishment, Lambert did. There is no evidence to suggest that this decision fell below prevailing professional norms or that Applicant was prejudiced in any way by the jury hearing from Lambert rather than Sigel. *Thompson*, 9 S.W.3d at 813 (ineffective assistance claims "must be firmly founded in the record").

Applicant also complains that trial counsel failed to object to inadmissible and harmful testimony. At trial, the State elicited testimony from Detective Travis, who testified to an unrecorded statement by Applicant that "it wasn't him...he wanted to blame somebody else, that he just happened to be [at the site where the most recent burglary had been committed] and was dropped off." Neither Sigel nor Lambert objected to this testimony. Only after the trial court noted the testimony's glaring inadmissibility did Sigel object and request a mistrial. The trial court denied the motion for mistrial, but nevertheless admonished the jury to disregard the testimony. Applicant's unrecorded statement, while inadmissible, was simply one

in which he insisted he hadn't committed any crime. Combined with the legal presumption that juries follow instructions to disregard, such as the one given regarding the unrecorded statement, Applicant suffered no prejudice from the admission of this testimony. *Waldo*, *supra*, 746 S.W.2d at 754 (curative instruction can eliminate harm flowing from improper admission of evidence).

More problematically, the jury heard that Applicant was found in possession of a police officer's identification, and the detective was allowed to speculate without objection from trial counsel as to what Applicant might do with that identification. When asked, on direct examination by the State, what that information would tend to convey, the detective responded that it was his "concern" that Applicant "was using it to....impersonate a police officer." There is no reason for allowing this information to come in without objection, even under a "truth" defense.[12] However, Applicant cannot show a reasonable probability that he would have received a more lenient sentence but for his counsel's failure to object. *Mitchell*, 68 S.W.3d at 644.

Finally, Applicant alleges that Sigel's cross-examination of two separate burglary victims alienated the jury. During the testimony of one burglary victim,

---

[12] Applicant's unrecorded, custodial statements were inadmissible and trial counsel's failure to object to their admission fell below prevailing professional norms. TEX. CRIM. PROC. CODE ANN. art. 38.22 § 3(a) (West). The same is true for the detective's speculation as to what the police officer identification was to be used for. TEX. R. EVID. 402, 403, 602, 701.

Siegel asked her to disclose her bra size to the jury. Sigel testified at the writ hearing that he questioned one victim about her bra size in order to demonstrate that it was not the same size worn by Applicant's girlfriend. In keeping with this Court's practice to "assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it," we find this explanation valid. *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005). Considering the fact that Applicant's girlfriend was the only female alleged to be a member of the group of people that burglarized homes with Applicant, Sigel's strategy to make it appear as though Applicant's group had no motive to steal the witness' clothing is clear.[13] Even if we found this elicitation of testimony to be ineffective, Applicant does not demonstrate that he would have received a more lenient sentence but for the admittance of this evidence. *Ex parte Rogers*, 369 S.W.3d 858, 863 (Tex. Crim. App. 2012).

Additionally, Applicant argues that Siegel caused another burglary victim to appear more sympathetic, when he asked about the specific medals her deceased fiancé was awarded during his military service. Again, Applicant ignores the record as a whole, which demonstrates that, immediately prior to Sigel's cross-examination,

---

[13] The record also indicates that Sigel questioned the witness not only on her bra size but also her dress and shoe size, which supports Sigel's assertion that the question was asked to establish that the victim's clothing was not suitable for Applicant's girlfriend.

the victim had been led through extensive questioning by the State in regards to her fiancé's military history and their relationship that ended suddenly when her fiancé was killed in action. The victim's emotions were being stoked by the State immediately prior to Sigel's cross-examination and, thus, we find no basis for Applicant's contention he was prejudiced because his attorney made this victim appear more sympathetic. *Rogers*, 369 S.W.3d at 863.

### *Sigel's Failure to Investigate and Present Mitigation Testimony*

During the punishment phase of trial, the State portrayed Applicant as an unremorseful, privileged athlete from a good family who deliberately committed criminal acts and whose character was so poorly regarded that not one person who had recent contact with the Applicant was willing to testify on his behalf. Applicant asserts that Sigel failed to investigate and present mitigation testimony from three particular witnesses that would have ameliorated that portrayal: Grayson West, Brandon West, and Danielle Delgaldillo.[14] We agree with Applicant that trial

---

[14] Both this Court and the United Supreme Court seem to regard a claim that trial counsel failed to call mitigation witnesses to testify on his behalf as part and parcel of a claim that trial counsel failed "to investigate and present mitigating evidence." *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000); *Wiggins v. Smith*, 539 U.S. 510, 538 (2003); *Ex parte Martinez*, 195 S.W.3d 713, 730 (Tex. Crim. App. 2006) (considering claim that trial counsel was ineffective for "failing to investigate and present a mitigation case based on temporary insanity"). Even if they are two distinct types of claims, both claims seem to require a showing that an uninvestigated and uncalled mitigation witness was nevertheless available to testify. *Ex parte Ramirez*, 280 S.W.3d 848, 853 (Tex. Crim. App. 2007) (holding that defendant must show that a witness was available to testify and that his testimony would have been of some benefit to the defense in order to prevail on a claim that trial counsel was ineffective for failing to call a witness); *Martinez*, 195 S.W.3d at 730 ("To determine whether applicant was prejudiced by trial counsel's alleged deficient performance, 'we re-weigh the evidence in aggravation against the totality of the available mitigating evidence.'").

counsel's performance in this regard fell below prevailing professional norms. However, in light of the overwhelming weight of the aggravating evidence, particularly when compared to the relative weakness of the available punishment evidence, Applicant is unable to establish a reasonable probability that he would have received a lighter sentence.

Grayson West, Applicant's youngest brother, stated in a sworn affidavit that he was never contacted by Sigel. He claimed that, had he been called as a witness, he would have been able to testify that Applicant's actions were entirely out of character. Grayson would have admitted to having a past history of drug abuse, which Applicant helped him conquer by allowing Grayson to live with him and surrounding him with better influences. With his past, Grayson believed he could make the jury understand that his brother was merely a victim of the poor decisions that drug use inspires.

Brandon West, Applicant's other brother, stated in a sworn affidavit that he, too, was never contacted by Sigel. Brandon stated that his testimony would have shown that Applicant has always been a "good person" who suffered from "poor self-esteem." In his opinion, Applicant had been the one to save Grayson's life by helping him overcome his drug addiction. The reason Applicant did this was

because he was a kind and decent person at his core. Brandon also stated that he had been witness to the changes that Applicant had gone through in the years leading up to his arrest and how drug addiction had altered his normally good-natured personality.

In her sworn affidavit, Danielle Delgaldillo, who referred to Applicant as her "oldest and dearest friend," also asserted that Sigel had never contacted or interviewed her, however, she also states that she was contacted by Applicant's father to determine on which date she would be available to testify. Thereafter, Applicant's father informed Delgaldillo that her particular date to testify had been set. Delgaldillo, though, states she "wasn't able to make it because [she] couldn't leave work (and town to travel to Dallas)." Delgaldillo claims that she would have testified to Applicant's good nature and that, given the uncharacteristically poor decisions he had made, he had the potential to be rehabilitated.

Although these three witnesses were not called, Sigel did call other mitigation witnesses including: Applicant's mother and father; former Texas Land Commissioner and gubernatorial candidate Garry Mauro, with whom Applicant had worked in 2004; Arthur Schecter, a Houston attorney and a former ambassador to Bermuda under President Clinton; Applicant's priest, Father Don Donahugh; Mike Owens, Applicant's high school football coach; and Bill Maddox, Applicant's

godfather and former editor of the Port Arthur News. The record suggests that these witnesses-including Applicant's parents–had not spoken to Applicant in over five years as of the trial date. Expert testimony was also provided demonstrating that Applicant had been sexually molested by a babysitter as a child, suffered from attention-deficit disorder, was not a sociopath or psychopath, and needed intensive drug treatment. While *Strickland* does not require trial counsel to investigate each and every potential lead, or present mitigation evidence at all, it does require attorneys to put forth enough investigative efforts to base their decision not to present a mitigation case on a thorough understanding of available evidence. *Rompilla v. Beard*, 545 U.S. 374, 382-90 (2005). Investigations into mitigating evidence should include efforts to discover all reasonably mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). A trial attorney's complete failure to investigate potential mitigation evidence can never constitute reasonable trial strategy. *Rompilla*, 545 U.S. at 390.

With regard to Delgadillo, Applicant has not shown that this witness's proposed testimony constituted "available" mitigation evidence. She states very clearly in her affidavit that she was asked to testify by Applicant's father (as opposed to trial counsel), but her job and the distance kept her from being able to

appear. Additionally, she offered only general, "good reputation" testimony that was likely cumulative of other available and admitted testimony. Consequently, even if we assume a failure to adequately investigate this witness, we cannot say, when weighing the aggravating evidence against the available mitigation evidence, that there would be a reasonable likelihood that the proceedings would have been different. *Wiggins*, 539 U.S. at 537.

However, both Brandon West and Grayson West were available to testify and yet never investigated by Sigel. Sigel did not explain specifically why he did not call either of Applicant's brothers, but he did offer a general explanation that he believed calling too many witnesses was poor strategy; the jury would have seen it as "overdoing it." While this could potentially be a valid explanation, there is nothing in the record to suggest that Sigel made this determination to forgo presenting this mitigating evidence *after* evaluating the available testimony and determining that it would be useful at trial. *Ex parte Woods*, 176 S.W.3d 224, 226 (Tex. Crim. App. 2005). Indeed, the closest Siegel could get to testifying that he had investigated both brothers was to say he "thinks" he spoke to them, however, both men stated unequivocally in their affidavits that no contact was made by any member of the defense team. Considering that these were the only two witnesses to have spent any significant time with the Applicant in the past five years and that they were

characterized by the State as victims of Applicant's crimes, it is clear that Siegel's failure to investigate amounts to deficient performance. Thus, Applicant has satisfied the first *Strickland* prong.

Having satisfied the first prong of the *Strickland* standard, Applicant also must demonstrate that counsel's failure to investigate and present these mitigation witnesses prejudiced his defense to support a Sixth Amendment violation. *Strickland*, 466 U.S. at 692. In other words, Applicant must show that there was a reasonable probability that the unadmitted mitigating evidence would have tipped the scales in Applicant's favor. *Ex parte Martinez*, 195 S.W.3d 713, 731 (Tex. Crim. App. 2006). In assessing prejudice, we re-weigh the evidence in aggravation against the totality of the available mitigating evidence including the evidence at trial and the habeas evidence. *Wiggins*, 539 U.S. at 534; *see also Porter v. McCollum*, 558 U.S. 30, 41 (2009). We consider the weight of the evidence, not just its relevance or admissibility. *See e.g. Ex parte Gonzalez*, 204 S.W.3d 391, 399 (Tex. Crim. App. 2006) (characterizing the applicant's relevant habeas evidence as "substantially greater and more compelling" than what was presented at trial).

The evidence Applicant claims should have been uncovered is considerably weaker than the caliber of unadmitted mitigating evidence relied upon by the United States Supreme Court to establish a showing of prejudice in *Wiggins v. Smith*.

In that case, the United States Supreme Court found a failure to investigate prejudicial because the defense attorney had failed to introduce evidence of a history of abuse including physical torment, sexual molestation, and repeated rape during the defendant's years in foster care. *Wiggins*, 539 U.S. at 534. The United States Supreme Court characterized this evidence as "powerful," and exactly the type of "troubled history" relevant to assessing a defendant's moral culpability. *Id.* at 534-35. Moreover, the defendant in *Wiggins* did not have a record of violent conduct that could have been used to offset this powerful mitigating narrative. *Id.* at 537.

And we have held that a defendant failed to establish prejudice when trial counsel failed to uncover even stronger evidence than the witnesses at issue in this case. In *Ex parte Martinez*, we held that a defendant could not show prejudice from trial counsel's failure to discover and introduce evidence of sexual abuse and a more detailed picture of physical abuse during the punishment phase of the trial. 195 S.W.3d at 730. We noted that the evidence establishing the defendant's moral blameworthiness was extensive, particularly in light of the brutal nature of the capital murder the defendant had committed. *Id.* And the jury did hear evidence that the defendant had suffered harsh physical abuse at the hands of his grandfather and a long period of abandonment by his mother. *Id.* We held that even though the omitted mitigating evidence was strong, there was still no reasonable probability

that the un-admitted mitigating evidence would have tipped the scale in the defendant's favor. *Id.* at 731.

We cannot conclude that there is a reasonable likelihood that Applicant's punishment would have been different had Sigel fully investigated and presented the testimony of Brandon and Grayson West. The aggravating evidence against Applicant in both guilt-innocence and punishment was particularly compelling. *See Martinez*, 195 S.W.3d at 730. Applicant committed at least 51 burglaries in the Dallas area using a unique method of breaking into people's homes. He organized an entire group of criminal cohorts who assisted him in entering the homes and pillaging them for items of personal and monetary value. Officers discovered Applicant's safehouse, which was filled with so many items that it took multiple officers to move and catalog the property, and one officer testified at trial that there was so much stolen property there wasn't enough room for it at the police property room.

Additionally, the State had significant evidence that Applicant was unrepentant about the burglaries and his past crimes. Applicant bragged about the other burglaries the police could not attribute to him. He attempted to thwart police attempts to recover more stolen property, and he even attempted to recruit his would-be-mitigation witnesses, Brandon and Grayson West, into the endeavor.

Indeed, he laughed to his brothers about his ability to evade police detection. And the jury also heard that Applicant had a long history of abusive behaviors towards his ex-girlfriend, Pamela Evans, and that he had persisted in harassing and abusing her despite multiple restraining orders.

In his effort to ameliorate this evidence, Sigel called several witnesses during the punishment phase to present a mitigation case. Sigel called close family members, a former coach, Applicant's godfather, people Applicant had worked for, and a priest. These witnesses testified extensively to these positive qualities and characteristics they had seen in Appellant. All of the witnesses stated that they were shocked by the transformation Applicant had undergone as a result of the drug use and that these crimes were not in keeping with Applicant's true character. Sigel also presented multiple doctors to testify that Applicant had been sexually abused as a young boy and to reinforce the testimony of personal witnesses that Applicant needed intensive drug treatment, rather than a long prison sentence.

Applicant contends that the testimony of Brandon and Grayson would have added something more substantial to Applicant's mitigation evidence by the nature of the fact that his brothers had a personal relationship with Applicant that had continued up until the crimes were committed and could testify that Applicant on-

drugs was very different from Applicant off-drugs.[15] Even assuming, *arguendo*, that this personal relationship evidence added more to the mitigation picture than Sigel had already presented, we do not find it reasonably likely that the brothers' testimony would have been compelling enough to change Applicant's sentence. *Bobby v. Van Hook*, 558 U.S. 4, 12 (2009) (concluding that, even if counsel was deficient for failing to investigate certain mitigation witnesses, the deficiency was not prejudicial because any arguably "new" evidence the witnesses would have offered was minor additional details that contributed nothing of value.). As previously stated, the evidence against Applicant was overwhelming. The fact that two more persons, who knew Applicant before and after his drug use, could have testified to Applicant's inherent good nature is not significant enough to tip the scales in Applicant's favor when weighed against all the evidence against him that supported a longer sentence. It is certainly not of the same caliber as the "powerful" evidence at issue in either *Wiggins* or *Martinez*. *See Wiggins,* 539 U.S. at 534.

Furthermore, Brandon and Grayson's testimony would not have been entirely beneficial. Both Brandon and Grayson would have testified with an obvious bias that could have been highlighted by the State on cross-examination. Having brought it up multiple times at guilt-innocence, the State also could have cross-

---

[15] It is questionable whether this can really be said about Brandon. The evidence at trial suggested that Brandon did not live near Applicant in the five years prior to the crimes and that any contact with Applicant during that time was infrequent at best.

examined Grayson about the fact that Applicant used Grayson's vehicle during his crime spree and, while in jail, solicited Grayson's help in moving stolen property from one of his storage units. Grayson had struggled with substance abuse himself and lived with Applicant at times in Dallas; Grayson would have been subject to a variety of cross-examination topics making it difficult for Sigel to distance Applicant from his life of crime and drug use in Dallas.

Similarly, Brandon was aware of Applicant's criminal exploits and was at least open to the idea of helping him move stolen goods to keep them concealed from the police. Brandon was also caught on tape talking with Applicant about Applicant's attempts to avoid having his jail phone calls recorded by using another inmate's identification number and laughing with Applicant over an instance in which Applicant had managed to free himself from an ankle monitor. When Applicant informed Brandon that he had hacked into Pamela Evans email from prison and sent out an email to her contacts saying that she was a "whore," Brandon replied, "Nice."

Given the cross-examination material at the State's disposal, Applicant has not shown a reasonable likelihood that the outcome would have been different had Sigel presented this new mitigation evidence. *Ex parte McFarland*, 163 S.W.3d 743, 757-58 (Tex. Crim. App. 2005) (defense counsel's decision not to call capital-murder defendant's former attorney to testify as a mitigation witness at punishment phase

did not constitute ineffective assistance because, although his testimony would have been beneficial, the State could cross-examine him about potentially hazardous topics). Any benefit their testimony might have provided would also have been counterbalanced by familial bias. *Woods*, *supra*, 176 S.W.3d at 227. ("While other witnesses may have been willing to testify on applicant's behalf, they would have been subject to cross-examination regarding their knowledge of applicant's involvement in Satanism, his proclivity for making and using pipe bombs, and his abusive behavior towards other people as well as animals."). Comparing the caliber of evidence that Brandon and Grayson could have provided to the significant aggravating evidence, we cannot say that Applicant has met his burden to show a reasonable likelihood that the jury would have reached a different punishment decision particularly in light of the mitigation evidence trial counsel did present to the jury. *Martinez*,195 S.W.3d at 731.

## *Conclusion*

In light of the totality of Applicant's representation in this case, we find that Applicant has carried his burden to show that trial counsel's representation fell below prevailing professional norms during the punishment phase of the trial. However, Applicant has not carried his burden to show that because of that representation, there is a reasonable likelihood that the outcome of the punishment

phase of his trial would have been different.  Consequently, we deny relief in this case.

Delivered: June 8, 2016

Do not publish